MERCHANTS' NATIONAL BANK *vs.* NATIONAL BANK OF THE COMMONWEALTH.

Suffolk. March 12. — June 23, 1885. W. ALLEN, COLBURN, & HOLMES, JJ., absent.

B., as agent of a bank, sold goods pledged to the bank as collateral security for the payment of his promissory note, and wrongfully deposited the money received therefor to his own account in the bank; and, against the balance thus produced, he drew a check on the bank, which was paid by that bank to another bank through the clearing-house, of which both banks were members The president of the bank on which the check was drawn, suspecting that B. was financially embarrassed, discovered that no payment had been made by B. on account of the goods entrusted to him for sale, and, looking at the condition of B.'s bank account, directed the return of the check to the bank to which it had been paid, after one o'clock of the day of such payment. The rules of the clearing-house provided that, whenever checks which were not good should be sent through the clearing-house, the banks receiving them should return them to the senders as soon as it should be found that they were not good, "and in no case shall they be retained after one o'clock." *Held,* that the check was paid under such a mistake of fact that the bank paying it could recover the amount from the bank to which it was paid, if the latter had not changed its position between one o'clock and the return of the check.

On a certain day, demand was made by a bank upon B. for payment of demand notes, which were then deemed to be amply secured by a pledge of goods as collateral security. Two days after this, B., who was a director in the bank, told the president of the bank that he had sold, or bargained to sell, a certain quantity of the goods, and the warehouse receipts were delivered to B., as agent of the bank, to enable him to transfer the goods sold, with the understanding

that the money received therefrom would be applied upon the debt for which they were held as collateral security. About a week afterwards, B. wrongfully deposited the money received from the sale to his own account in the bank; and three days later, against the balance thus produced, he drew a check on the bank, which was paid by that bank to another bank through the clearing-house, of which both banks were members. The president of the bank on which the check was drawn, suspecting that B. was financially embarrassed, discovered that no payment had been made by B. on account of the goods entrusted to him for sale, and, looking at the condition of B.'s bank account, directed the return of the check to the bank to which it had been paid. *Held*, in an action by the bank paying the check to recover the amount thereof against the bank to which it was paid, that the plaintiff was not chargeable with laches in its dealings with B.

If a bank is entitled to maintain an action to recover back the amount of a check paid by mistake to another bank through the clearing-house, the fact that the latter bank has credited the amount to the account of the customer depositing it does not render the depositor, instead of such bank, liable to the action.

In an action by one bank against another, to recover back the amount of a check paid through the clearing-house, under a mistake of fact caused by the fraud of the drawer, the measure of damages is the difference between the amount of the check and the amount for which he was entitled to draw; and the fact that, where there is not enough money on deposit to pay a check in full, the ordinary custom is to return the check, is immaterial.

CONTRACT to recover $15,000, the amount of a check, dated September 3, 1883, drawn on the plaintiff by Benjamin F. Burgess and Sons, in favor of the Massachusetts Loan and Trust Company, and by it deposited, on September 3, with the defendant. Trial in this court, before *C. Allen*, J., who reported the case for the consideration of the full court, in substance as follows:

The plaintiff and defendant banks are members of an unincorporated association called the Boston Clearing-House Association, whose rules and course of business are the same as set forth in the cases of *Merchants' Bank* v. *Eagle Bank*, 101 Mass. 281, and *Exchange Bank* v. *Bank of North America*, 132 Mass. 147, to which reference is to be made.

Benjamin F. Burgess and Sons were depositors with the plaintiff bank and kept a bank account with it, and Benjamin F. Burgess was one of the plaintiff's directors. They were indebted to the plaintiff in the sum of $83,000 on three notes, payable on demand, with a pledge of warehouse receipts for twelve hundred and seventy hogsheads of sugar as collateral security, and in the further sum of $129,500 on three other notes, payable on demand, with a pledge of United States bonds

and other securities as collateral. Demand was made for the payment of the notes for $83,000 on the 23d or 24th of August, 1863, and, within two days after the demand, Burgess told the plaintiff's president that he had sold or bargained to sell two hundred and seventeen hogsheads of the sugar; and the warehouse receipts were thereupon entrusted to Burgess, as agent of the bank, to enable him to deliver the sugar so sold, with the understanding that the money received for the sugar should be brought to the bank and applied on the debt. The sugar was sold on August 23, to Nash, Spaulding, and Company, who gave their check for $7500, dated September 1, and payable to Benjamin F. Burgess and Sons. This check was deposited with the plaintiff by that firm, on September 1, to the credit of Benjamin F. Burgess and Sons, and the same was entered to their credit in their bank account, the plaintiff not knowing at the time, nor until September 5, that it came from the sale of the sugar. Prior to that time, when Burgess and Sons had been allowed to dispose of goods pledged by them as collateral security to the plaintiff bank, they had usually deposited the money or check received upon the sale thereof, and then given their own check for the same amount to pay to the bank the amount received from the sale of the collateral security. There was no evidence of any prior instance in which they had failed, in this or in some other way, to return to the bank the proceeds of such sale, to be applied upon the debt.

On the morning of September 4, there was an apparent balance of $17,145 56 to the credit of the firm of Burgess and Sons, the item of $7500 being included as an item to their credit, entered on September 1, as above stated. During the forenoon of September 4, three checks of Benjamin F. Burgess and Sons, of $1000, $225, and $200, respectively, were paid over the counter by the plaintiff. On the same day the check in controversy in this action came from the defendant bank to the plaintiff bank through the clearing-house, where it had been provisionally paid, in accordance with the usual course of business in the clearing-house. This check was received by the plaintiff at about noon, and was in the first instance entered to the debit of Benjamin F. Burgess and Sons on the plaintiff's books; but at about one o'clock the president of the plaintiff received the

following communication, signed by the agent of J. S. Morgan and Company : " Please take notice that any and all property and merchandise in your hands, pledged to you by Benjamin Burgess and Sons, and the proceeds of any such property and merchandise, is, and the same are, so far as not required for the purposes of such pledge, the property of, and must be accounted for, and paid over to, J. S. Morgan and Company." This led the president to think that Burgess and Sons were in financial trouble, and he then discovered that no payment from the avails of the sugar had been made upon the indebtedness for which the sugar had been pledged as collateral security. He looked at the condition of their bank account, and immediately gave directions to send back the check of $15,000 to the defendant, and to demand the repayment of the money, as the check was not good; and the entry of it in the account of Burgess and Sons was erased. At the same time, by the direction of the president, there was debited to the account of Burgess and Sons $29,500, which was the amount of one of the notes held by the plaintiff bank against them, for which other collateral was held as security, and this was afterwards, on the same day, corrected by substituting $23,000, the balance of one of the notes for which the sugar was held as collateral, upon which demand had been made. The messenger started from the Merchants' Bank with the check at two or three minutes after one o'clock, and demand was accordingly made upon the defendant at from seven to twelve minutes after one o'clock, on September 4, on the ground that the check was not good; and repayment was refused. The defendant had entered the check of $15,000 to the credit of the Massachusetts Loan and Trust Company on the day of its deposit, and the defendant did not change its position towards said company in the interval between one o'clock and the time when the plaintiff's demand was made as aforesaid.

Where there is not enough money on deposit to pay a check in full, the ordinary custom is to return the check as not good.

The plaintiff held no surplus of security upon either branch of the indebtedness of Burgess and Sons which could be applied to make good the $7500. The president of the plaintiff bank, who was the only principal officer testifying, and who gave the directions for the return of the check, had no knowledge on

September 4 that the sugar pledged as collateral security was not sufficient to secure all of the notes of Burgess and Sons held by the bank for which the collateral was given.

Burgess and Sons borrowed from the plaintiff, upon memorandum checks, $2000 on August 29, and $6000 on August 31, which sums were placed to their credit on those respective dates. Burgess handed the checks of his firm for these amounts to the teller of the plaintiff bank, asking that his firm might be credited with the amounts thereof, and the checks " held over and charged in the next day." These checks were not at the time entered in the account upon the plaintiff's books to the debit of Burgess and Sons, but were merely kept in the drawer as memorandum checks. Burgess was desirous of getting this transaction out of the books of the bank.

On September 1, after making the deposit of $7500 received from the sale of the sugar, Burgess directed the teller to charge the two memorandum checks in the account, which was accordingly done, and these two charges are shown by the items of $6000 and $2000 in the statement of account as checks charged on that day. In this way he returned and repaid the money credited in the two checks to Burgess and Sons. Burgess and Sons were not entitled to the credit obtained on September 1 by the deposit of the check for $7500.

The defendant contended that the remedy of the plaintiff, if any, was not against the defendant, but against the Massachusetts Loan and Trust Company ; that the plaintiff got the benefit of the sale of the sugar by applying the proceeds on another loan ; and that for the above reason, and also in any view of the case, there was no such mistake of fact as would entitle it to recover.

*S. Bartlett & R. D. Smith,* for the plaintiff.

*H. D. Hyde & S. Lincoln,* for the defendant.

DEVENS, J. The rules and course of business of the unincorporated association called the Boston Clearing-House Association have been so set forth in the recent decisions of this court that they do not require to be here fully restated. They were adopted solely for the purpose of facilitating exchanges and the adjustment of accounts between the banks. By a contract between them, an association is formed, which is their common

banker.   To this association each bank, which is indebted by
reason that more checks, &c. are presented, as drawn upon it,
than it presents, as drawn against the other banks who are
members, pays the balance found due from it to the association,
while each bank that shows a balance in its favor receives from
the association the amount by its check.   Mistakes that may be
made in this computation, because checks are not good, are not
settled by the association, but between the banks themselves;
and such checks are to be returned by the banks receiving the
same to the banks from which they are received as soon as it
shall be found that they are not good, " and in no case are they
to be retained after one o'clock."   To the regulations of this as-
sociation, the customers of the banks are not parties, and, what-
soever effect is to be given to them as between the banks, their
customers are not in a situation to claim the benefit of them, nor
are they liable to be injuriously affected by them.   *Merchants'
Bank* v. *Eagle Bank*, 101 Mass. 281.   *Bank of North America* v.
*Bangs*, 106 Mass. 441.   *Manufacturers' Bank* v. *Thompson*, 129
Mass. 438.   *Exchange Bank* v. *Bank of North America*, 132 Mass.
147.   By these regulations, it was, in substance, agreed in the
case at bar, that, if Burgess and Sons had to their credit a sum
sufficient to meet the check for which they were entitled to
draw, the amount of which is here demanded, the provisional
allowance of it at the clearing-house should stand; but that, if it
appeared on investigation that they were not entitled to draw
for any such sum, the check should not be retained by the plain-
tiff bank after one o'clock.   The bank which had sent the check
to the clearing-house would then be notified that it was not good,
and that repayment of the amount of it would be expected by
the bank on which it was drawn.

The check was not returned to the defendant bank until after
one o'clock.   It is not disputed by the plaintiff, that if, in conse-
quence of this, the defendant had changed its position, as if it
had paid over the amount of the check to the owner, who had
deposited it with the bank for collection, the bank should not
suffer; but it contends that when, by a mistake as to a matter
of fact, it has delayed the return of the check until after one
o'clock, this cannot be taken advantage of by the bank on behalf
of the owner of the check, there having been no change in its

position in the interval between one o'clock and the actual return of the check.

The case of *Merchants' Bank* v. *Eagle Bank, ubi supra,* goes far to decide the case at bar. It was there held that the manifest purpose of the provision in the clearing-house rules was to fix a time at which the creditor bank was authorized to treat the check as paid, and so deal with it in its relations with others. The court declined to adopt the theory that a failure to return a bad check before one o'clock to the bank sending it through the clearing-house would work a forfeiture of the right to return it, or, of itself, constitute a bar to an action to recover its amount; and held that a failure to comply with the stipulation as to returning the check would leave the parties in the same position as when a payment is made under a mistake of fact in the ordinary way. This case has been since cited with approval. *Manufacturers' Bank* v. *Thompson,* and *Exchange Bank* v. *Bank of North America, ubi supra.*

In *Preston* v. *Canadian Bank of Commerce,* 23 Fed. Rep. 179, it was held otherwise, and there decided that a mistake discovered after half-past one o'clock, which was there the hour for returning checks, could not be corrected by the bank making it, nor the check then returned. It is said by Judge Blodgett, referring to the case of *Merchants' Bank* v. *Eagle Bank, ubi supra,* " The Massachusetts court puts its decision on the ground that you may correct a mistake of this kind at any time after it is discovered, if it places the party to whom the check is returned in no worse condition than it would have been in if it had been returned within the stipulated time ; thus overlooking the rule that parties may agree that they shall not have the right to correct mistakes unless done within a limited time." But we have not overlooked the right of parties to make such agreement as they choose. The question is as to the interpretation of the rule which they, as members of the clearing-house, have adopted. The rule is, " Whenever checks which are not good are sent through the clearing-house, they shall be returned by the banks receiving the same to the banks from which they were received as soon as it shall be found that said checks are not good : and in no case shall they be retained after one o'clock." If it were intended that mistakes should never be corrected unless

discovered by one o'clock, this should in terms explicitly appear. As it does not, it seems to us the more correct interpretation to hold that the rule authorizes the bank receiving the check, after one o'clock arrives and the check is not returned, to treat it in all transactions as if it were good. If, therefore, the bank changes its position, it will suffer no loss by reason of it. On the other hand, if the mistake is discovered after one o'clock, and the bank receiving the check has not changed its position by reason of the expiration of the time, it should rectify the mistake when reasonable care has been exercised by the bank on which it was drawn.

The defendant also relies much on the case of *Merchants' Ins. Co.* v. *Abbott*, 131 Mass. 397, as establishing a somewhat different principle from the case of *Merchants' Bank* v. *Eagle Bank*. The latter case is not there cited, but we do not find any intention to impugn its authority. It appears to us quite distinguishable from the case here presented. Denny, Rice, and Company held a valid debt due from Abbott, whose premises had been insured by the plaintiff company, and had been destroyed by fire. Abbott assigned to Denny, Rice, and Company his claim against the plaintiff, which, at Abbott's request, paid the amount of the loss, as adjusted between itself and Abbott, to Denny, Rice, and Company. There was no question of the validity or genuineness of the assignment, and, by the payment made by the plaintiff, the debt which Abbott owed Denny, Rice, and Company was discharged and satisfied, and this might have been so pleaded by Abbott had he been sued thereon. *Tuckerman* v. *Sleeper*, 9 Cush. 177. A year later, the plaintiff discovered that the fire had been caused by Abbott, and that his proofs of loss were false and fraudulent, and, six months afterwards, brought an action against Abbott and Denny, Rice, and Company. It was conceded that Denny, Rice, and Company had no knowledge of any fraud. As to Abbott, it was not doubted that the plaintiff might recover. If the money had been paid to him, it could have been recovered as money paid under a mistake of fact; and the payment by the plaintiff, at his request, in discharge of his debt to Denny, Rice, and Company, was equivalent to a receipt by him of so much money. But as to the other defendants, Denny, Rice, and Company, the case was deemed to stand as if

the money had been paid by the plaintiff to Abbott, and by Abbott to them in the ordinary course of business, in which case it could not be doubted that, while the plaintiff could recover the money from Abbott, neither Abbott nor the plaintiff could recover the amount from Denny, Rice, and Company. There was not only no mistake between the plaintiff and Denny, Rice, and Company, but by reason of the mistake of the plaintiff — produced by the fraud of Abbott, to which Denny, Rice, and Company had in no way contributed — they had been induced to surrender and discharge the debt which Abbott owed to them. It was impossible to restore them to their original position.

In the case at bar, there was no change of circumstances, after the time when the defendant had a right to treat the check as paid and before it was returned, which would in any way subject the defendant to loss, or render it unjust for the plaintiff to recover. The fact that the defendant gave credit to its depositor in this interval did not make the defendant liable to such depositor when a mistake was discovered which showed it to have been erroneously done.

The mistake made by the plaintiff was such as would bring the case within the rule which has heretofore been held applicable on this subject. There was no carelessness, as in *Boylston National Bank* v. *Richardson*, 101 Mass. 287, where the paying teller neglected to examine the account of the drawer of a check, which account had not varied materially for a month, and which had not been sufficient to meet the check for three months, and paid it without examination. Such a transaction showed no mistake of fact, in any legal sense, but laches simply. The teller in that case was not misled in any way, and had no reason to suppose the account of the depositor was otherwise than as it actually appeared.

The mistake in the case at bar was, that the account of Burgess and Sons with the plaintiff bank was really different from that which appeared on its books, and this was effected by the wrongful act of Burgess. He had received a check for $7500 for property belonging *in specie* to the bank, which it was his duty to have delivered to the bank as its property. Instead of doing this, he deposited the check as the property of

Burgess and Sons, and by that act obtained for them a credit on the books of the plaintiff bank to which they were not entitled. Against the false balance thus produced by depositing the money of the bank as if it were their own, Burgess and Sons fraudulently drew the check in controversy, and it led to the retention of the check until a few minutes after one o'clock.

But if money paid under a mistake of fact may be recovered, and if the credit to which the defendant was entitled at one o'clock might be recalled on discovery of such a mistake, it is urged that the plaintiff should then be able to show mistake, misapprehension, or ignorance of some definite and material fact which directly affected the obligation of the plaintiff to pay the check; and that the credit was sought to be recalled under a vague apprehension of insecurity produced by reports of the embarrassment of Burgess and Sons. This, it is contended, is not sufficient, even if subsequent investigation has shown that the apparent credit of Burgess and Sons with the plaintiff bank was fraudulently obtained in the mode above stated. It appears by the report that the president of the plaintiff bank, being led to think that Burgess and Sons were in financial trouble, then discovered that the avails of the sugar confided to Burgess to sell had not been received by the bank upon the indebtedness for which it was pledged as collateral security; and, looking at the condition of Burgess and Sons' bank account, he directed the return of the check.

But even if, at the time of the return of the check, the president could not have stated the exact way in which the mistake was made, when subsequently investigated, it is shown to have arisen from the same transaction to which he then attributed it, and which caused him to direct the return of the check, namely, the sale of the sugar confided to Burgess. He supposed that the proceeds of the sugar had not been paid into the bank at all, while in fact they had been paid in, but in such a manner as to obtain, by spoken or acted falsehood, a wrongful credit in favor of Burgess and Sons.

Nor can it be seen why the plaintiff bank might not have returned the check the next day, if there had been no change in the circumstances, and if it had then discovered, as it actually did, the exact character of the mistake. It cannot affect the

plaintiff unfavorably that it offered to do so earlier, and on the same day it received the check, even if its president could not then formally state the exact mode in which the mistake had occurred.

The defendant further urges, that there has been such laches on the part of the plaintiff bank in its dealings with Burgess that it is not entitled to recover. *Dana* v. *Bank of the Republic*, 132 Mass. 156. On August 23 or 24, 1883, demand was made upon Burgess for payment of demand notes which were then deemed to be amply secured by sugar as collateral security. Two days after this, Burgess told the plaintiff's president that he had sold or bargained for the sale of two hundred and seventeen hogsheads; and the warehouse receipts were delivered to him, as agent of the bank, to enable him to transfer the sugar sold, with the understanding that the money received therefrom would be applied upon the debt for which it was held as collateral security. A check was received therefor, on September 1, of $7500, which was the one wrongfully deposited by Burgess to the credit of Burgess and Sons. The laches which the defendant alleges is in failing to look after the proceeds of this sugar until September 4. But up to this time the plaintiff bank had not supposed Burgess and Sons to be in financial straits; they had always been allowed to dispose of the goods pledged by them as collateral, and had always faithfully accounted for the proceeds of the same. That no suspicions were in fact excited until September 4 is quite clear, and the circumstances are not such that we can say there has been laches on the part of the plaintiff that should deprive it of its remedy for the mistake into which it was led by Burgess's fraud.

At the trial before a single judge, the defendant contended that the remedy of the plaintiff, if any, was not against the defendant, but against the Massachusetts Loan and Trust Company; and that the plaintiff got the benefit of the sale of the sugar by applying the proceeds on another loan. Neither of these positions is tenable. Where a party who has paid money is entitled to recall it, he may do so, provided the agent has not paid it over to the principal, and that no change has taken place in his situation which would render it unjust to him. The fact that the agent has passed the money in account with

his principal, without any new credit being given to the principal, will not of itself be sufficient to enable the agent to retain it.   Story on Agency, § 300.

Nor can the plaintiff obtain any benefit from the sale of the sugar by Burgess, except by this action, which, to the extent to which it is maintained, will restore to the plaintiff that which by Burgess's fraud it has been induced to pay out.

The question remains, how much the plaintiff is entitled to recover.   By the course of dealing between the banks composing the Clearing-House Association, when there is not enough money on deposit to pay a check in full, the ordinary custom is to return it as not good.   This custom has no application to the inquiry how much the plaintiff may now recover, which is one outside of the clearing-house rules.   These were not complied with by the return of the check within the time, and cannot control in determining how much shall be returned after payment of it has been made.   If no mistake had been made, and the plaintiff had followed the custom, it is true that it would have refused the check entirely, and thus have kept in its control the other funds of Burgess and Sons not the subject of mistake, which it might have applied in offset to the other claims which it held against Burgess and Sons.   But the defendant is not bound to indemnify the plaintiff against all the incidental consequences of its mistake, but only to return that money which was the subject of the mistake.   So far as Burgess and Sons were entitled to draw, the defendant has now a right to hold.   The fact that, if Burgess and Sons had overdrawn, and this had been known to the plaintiff, it would have wholly refused the check, should not deprive the defendant of that which it was the duty of the plaintiff to pay him upon a check properly drawn, when it has itself honored the check as it was actually drawn.   The plaintiff bank was entitled, if it saw fit, to pay the check to the amount actually due from it to Burgess and Sons, if the defendant was willing to accept that sum.   To this Burgess and Sons could have made no objection.

Nor is the plaintiff here entitled to recover any money to the use of Burgess and Sons.   It would do so if it recovered the money for which Burgess and Sons had a right to draw, even if, when recovered, it would go to the use of Burgess and Sons only

by the payment of their other debts or liabilities to the plaintiff bank.

The money which was the subject of the mistake was $7500. In the forenoon of September 4, and necessarily before the check of the defendant could be treated as paid, three checks, together amounting to $1425, were drawn from the deposit of Burgess and Sons, which was nominally $17,145.46. These two sums being deducted from this deposit, there remained $8220.46, for which Burgess and Sons had a right to draw. The amount which the plaintiff is entitled to recover is the difference between this sum and $15,000, with interest from the date of the writ.                                        *Judgment accordingly.*