SPENCER & COMPANY *v.* BANK OF HICKORY RIDGE.

Opinion delivered November 23, 1914.

1.   FORGED DRAFT AND BILL OF LADING—PAYMENT—RECOVERY.—Appellant paid a draft with bills of lading attached to appellee bank, and brought an action against appellee, when the bills of lading proved to be forged, to recover the amount so paid. *Held,* while the drawer of a draft with bills of lading attached, has the right to suppose that the collecting bank has ascertained that the bills of lading are genuine, and that the presentation of a draft for pay-

ment is in effect a representation upon the bank's part of the genuineness of the draft and bills of lading, still appellant can not recover from appellee, if it appears that in accepting the draft, appellant did not rely upon any representations made by appellee, but did rely solely upon his own knowledge and information concerning the transaction.

2.  FORGED DRAFT AND BILL OF LADING—PAYMENT—RECOVERY—UNNECESSARY DELAY.—Appellant purchased corn from one F. and paid for same by paying a draft with bills of lading attached to appellee bank. Immediately upon discovering that the bills of lading were a forgery which was after the lapse of one month, appellant notified appellee of that fact. *Held*, in an action by appellant against appellee, to recover the amount paid by him, an instruction is erroneous and prejudicial, which charges that although the bills of lading were a forgery, that appellant could not recover, if he delayed an unreasonable time in notifying appellee of his discovery of the forgery; such an instruction not being warranted by the facts.

Appeal from Cross Circuit Court; *W. J. Driver,* Judge; reversed.

Appellants sued to recover $718.07, the amount of a certain draft which had been drawn on, and paid by, them. To this draft there were attached bills of lading for three carloads of corn, which bills of lading proved to be forgeries, and appellants testified that the circumstances under which they paid the draft were as follows: That one F. F. Farrin called at the offices of appellants, Spencer & Co., in the city of Jonesboro, late in January or early in February, 1912, and stated that the purpose of his visit was to buy some corn with the shuck on, but they were unable to agree on the price, and Farrin stated that he thought he could do better by going to southern Illinois; and that he returned again to their office early in February and said that he had bought ten cars at forty-four cents per bushel, f. o. b. points in southern Illinois, and offered to sell Spencer & Co. four of these cars at forty-six cents per bushel; Farrin said that his brother was in Illinois and would attend to loading out the corn. This offer was accepted,

and it was agreed that Farrin should draw on them for 75 per cent of the invoice value of the corn, and that if Spencer & Co. decided to ship any of this corn to a pre-pay station, that Farrin should prepay the freight and add the freight charges to the draft, and that after the corn was delivered and unloaded, they were to pay him the 25 per cent balance. H. J. Spencer, of this firm, testified that he next saw Farrin about the middle of Februray, and was asked by him if the corn had been received, and he was told that it had not been. That Farrin stated he had heard from his brother in Illinois, and was satisfied the corn had been loaded out, but that he would telegraph his brother right away and ascertain the cause of the delay. That after a short absence Farrin returned to their office, and stated that he had just heard from his brother, who had misunderstood the shipping directions, and that his brother had mailed the bills of lading to Hickory Ridge, instead of to Jonesboro, the explanation being made that Farrin was at Hickory Ridge when he wired the shipping directions, which had been given him by Spencer & Co. Farrin stated that he would go to Hickory Ridge and get these bills of lading, and as it was about train time he left at once for that purpose. That later in the day, about the time when Farrin would have arrived at Hickory Ridge, there was a telephone call from that place which proved to be from a Mr. Thompson, the cashier of the appellee bank, and in the conversation which ensued, Mr. Thompson stated that Farrin was present and had certain bills of lading and wanted to draw on Spencer & Co. The witness further testified that he talked with both Mr. Thompson and Mr. Farrin, and that one or the other of them gave the car numbers and the weights of the corn, but he was not certain which of them gave him this information, but that it was Mr. Thompson who asked about the money and that Thompson said, in effect, that Farrin wanted to draw for this money, and Thompson asked if the draft would be paid, and that Thompson was told that Spencer & Co. did not owe Farrin any money, but had bought some corn from him and

would pay the draft if the amounts were correct, and if the draft was attached to the bills of lading. That during the conversation with Thompson, they took down the weight of each car and the number of pounds of corn, and figured so as to have it correct, and that they did this while they held him on the wire. They had to estimate the amount of freight charges, but as nearly as they could tell the draft was made out for the correct amount, providing the corn had been shipped, and, having made this calculation, they told Mr. Thompson that they would honor the drafts if they were attached to the bills of lading for the three cars of corn. This draft was drawn by Farrin in favor of the Bank of Hickory Ridge on Spencer & Co., at Jonesboro, Arkansas, and attached to it were three Cotton Belt bills of lading, dated at Gale, Illinois, February 8, 1913, signed by E. L. Smith, agent for that railroad. The bill of lading was in the usual form, and showed Spencer & Co. to be both the consignor and consignee. The other two bills of lading were the same except the difference in car numbers and weights. The draft was endorsed by the Bank of Hickory Ridge, by W. A. Thompson, cashier, but the bills of lading were not endorsed. There was nothing about the bills of lading to indicate that they were forgeries, and he admitted that if they had been presented to him personally by Farrin, he would have paid the attached draft. S. C. Spencer, the other member of the firm of Spencer & Co., testified, and substantially corroborated the testimony of H. J. Spencer; and it was shown by them that they sold the corn in the usual course of their business to customers residing at Little Rock and other points, and that they had no notice of the fact that the bills of lading were forged until these customers complained of the nondelivery of the corn. Whereupon they proceeded to investigate, and found that Gale was not a station upon the line of the Cotton Belt railroad, and that no corn had been shipped by Farrin from that point, and that the bills of lading were consequently worthless. This information was obtained on the 14th of March, and Spencer & Co. immediately

wrote the Bank of Hickory Ridge advising them of that fact and requesting the bank to refund the money which had been paid on this draft. The bank declined to pay this money, and this suit resulted.

Mr. Thompson, the bank cashier, testified that he had only a slight acquaintance with Farrin, who had opened a small account with his bank, and that when Farrin arrived at Hickory Ridge, he called at the bank and asked that the bank cash a draft which he had drawn on Spencer & Co., with bills of lading attached, but that this request was refused, whereupon Mr. Thompson stated that he would take the draft for collection, and that he would pay the money when notified by his correspondent at Jonesboro of the collection of the draft; but Farrin stated that this was not satisfactory, as he wanted the money at once. That thereupon Farrin called Spencer & Co. and had a conversation with them about the payment of this draft, a portion of which was heard by witness. That Farrin outlined to Spencer & Co. what he wanted, and described the bills of lading, and spoke to them about paying the draft, and that after Farrin finished his conversation, he was called to the phone and talked with Spencer & Co. himself. Spencer & Co. understood what Farrin wanted before he talked with them at all, and he was assured by them that they would pay the drafts. That he told Spencer & Co. that Farrin wanted the money on these drafts that day, and he asked them if they would protect the bank if it would pay Farrin the money, and he was told that they would do so. and, on the strength of this statement, he paid Farrin the money. That no charge was made for cashing the draft, and the bank was not interested in the transaction. That witness knew Spencer & Co. to be reliable and responsible, and upon their assurance that they would protect the bank in the transaction they let Farrin have the money, and that he did let Farrin have the money that day, and has not seen him since, and that it was nearly a month before he heard anything further about the transaction, and that the bank would not have advanced Farrin the

money on the bills of lading but for Spencer & Co.'s statement that they would protect the bank in doing so. A. H. Evans, who was in charge of the telephone office at Hickory Ridge, testified and substantially corroborated Mr. Thompson. This witness testified that Farrin came into the telephone office and talked with Spencer & Co. about ten minutes before Thompson came in, but that Thompson came in before Farrin had finished his conversation, and that Farrin figured out the amount of the corn and told Spencer & Co. the amount for which he wished to draw; that the side phone was out of commission and the conversation occurred over the switch, and he heard that end of the conversation between Thompson and Spencer & Co., and heard Thompson inquire, "Will you protect us?" and inferred from the remainder of the conversation that an affirmative reply was given.

At the conclusion of the evidence the court gave various instructions which were as favorable to appellants as they could ask, the correctness of none of which is seriously questioned, except that appellants strongly insist that a verdict should have been directed in their favor, and except that the court erred in giving the instruction numbered 6, which reads as follows:

"No. 6. In this case, even if you should find that the bills of lading are a forgery, yet, if you further find that plaintiffs, after discovering such forgery, delayed an unusual time in giving notice of such fact to defendant, it will be your duty to find for defendant."

*E. L. Westbrooke,* for appellant.

1. Where a loss, which must be borne by one of two parties alike innocent of a forgery, can be traced to the neglect or fault of either, it must be borne by him, even if innocent of intentional fraud, through whose means it has succeeded. The bank's unqualified indorsement makes it liable. 54 S. E. Rep. 204; 4 O. St. 628; 151 Mass. 280, 21 Am. St. Rep. 451; 106 Mass. 441; 56 L. R. A. 929; 57 Ark. 142; 17 Mass. 33; 108 N. W. 546; 10 Wheat. 333; 8 Am. Rep. 349; 22 *Id.* 104; 63 Tex. 610; 96 Am. Dec. 554;

88 Tenn. 299; 13 S. W. 716; 64 Am. Dec. 610; 50 N. E. 723; 36 N. W. 289; 71 Pac. 43; 60 L. R. A. 43; 14 La. Ann. 462; 74 Am. Dec. 438. The supposition is that the bank had taken proper precaution to ascertain that the signatures were genuine. 105 N. Y. Supp. 335; 73 Ark. 561.

Money paid by the drawee upon a draft drawn against "indorsed bills of lading" which are forgeries and accepted "against" such bills of lading in ignorance of the fraud may be recovered from the payee. 114 Fed. 433 and cases, *supra.*

2. The instructions given for appellant state the law. 53 Ark. 795.

*Killough & Lines,* for appellee; *Lamb & Caraway,* of counsel.

1. Under the undisputed evidence the judgment is correct. The drafts were genuine and the consideration in a bill of exchange, as between drawer and drawee, does not affect the rights of a *bona fide* endorser for value. An acceptor of a draft discounted by a bank with bill of lading attached which acceptor and bank regard as genuine at time of acceptance, but which turns out to be a forgery is bound to pay the draft at maturity. 119 U. S. 551; 64 Kan. 211; 126 N. C. 176; 19 Tex. Civ. App. 246.

2. There is no conflict in the instructions.

SMITH, J., (after stating the facts). The case of *LaFayette v. Merchants' Bank,* 73 Ark. 561, is similar in many respects to the case at bar. There the facts were that one Whitlock had an agreement with the plaintiffs, LaFayette & Bro., by which LaFayette & Bro. agreed to pay drafts drawn by Whitlock on them for the purchase price of cattle, provided that a bill of sale, signed by the vendor, conveying the cattle to LaFayette & Bro., should be endorsed on the back of the draft as security for the payment of the draft. To enable Whitlock to have these drafts, with bills of sale in proper form, blank drafts, with bills of sale printed on the back, with spaces for description of cattle purchased and for the signature of the owner, were prepared and given to Whitlock. The intention was that he should buy these cattle in the Indian

Territory, where he lived and where the firm of LaFay-
ette & Bro. was in business. He afterward drew drafts in
favor of certain persons living within the Territory, and,
without their knowledge or consent, endorsed their names
on the backs of the drafts, and signed their names to the
bills of sale on the backs of the drafts, and then delivered
the drafts to the Merchants' Bank of Fort Smith, which
paid him full value therefor. The bank endorsed the
drafts and sent them to a bank at Muskogee, Indian Ter-
ritory, which presented them to LaFayette & Bro. for
payment, and they paid them. Neither the Merchants'
Bank nor LaFayette & Bro. had any notice of the forgery,
and both supposed that it was a legitimate transaction
on the part of Whitlock. On the discovery of the fraud,
LaFayette & Bro. demanded that the bank repay the
money, and upon its refusal to do so, they brought an
action to recover. In that case it was said that as a gen-
eral rule money paid under a mistake of fact could be re-
covered; that the right of recovery proceeded upon the
theory that LaFayette & Bro. had paid out money which
they were under no obligation to pay, and which the party
to whom it was paid had no right to receive or to retain,
and that the law, therefore, raised an implied promise to
refund this money. It was there said that the reasons
which permit a recovery are equitable in their nature,
and that the rule does not apply in any case where it
would be unjust or inequitable to compel the return of
the money. In discussing the rule of the law merchant
as applicable to the facts there stated, it was said:

"But no such reason exists in this case. When this
draft was presented to the plaintiff for payment, it had
the indorsement of the defendant bank upon it, as well as
the indorsement of the name of the payee and his signa-
ture to the bill of sale on the back of the draft. The
plaintiffs had the right to suppose that the bank had taken
proper precautions to ascertain that these signatures
were genuine. The presentation of the draft for payment
under such circumstances was in effect a representation
on the part of the bank either that it had paid or that it

would pay to the payee, or to his order, the amount named in the draft, and that his signature both to the bill of sale and indorsed on the draft was genuine. Under these circumstances the plaintiffs paid over the money to the collecting bank, acting as the agent of the defendant in making the collection, and it seems to us that the equities are in favor of the plaintiffs, and that a recovery should be allowed, unless there is some rule of law that forbids it.

"Now, there is an exception to the rule permitting a recovery of money paid under a mistake of fact in the case of a drawee paying a draft or check upon which the name of the drawer has been forged. The reason for the exception is said to be that the drawee should know the signature of the drawer, and that he is guilty of carelessness in paying a check where the drawer's name has been forged, and that, as between him and an innocent holder, no recovery should be allowed. Defendant contends that the exception applies also where the name of the drawer is genuine, and where the drawer has himself forged the signature of the payee. There is authority to support that position. The Supreme Court of the United States so declared the law in an opinion delivered by Chief Justice Taney. The court said that 'the acceptor of a bill is presumed to accept upon funds of the drawer in his hands, and he is precluded by his acceptance from averring to the contrary in a suit brought against him by the holder.' *Hortsman* v. *Henshaw,* 11 How. 177; Bigelow on Bills and Notes, 568.

"But, though there are cases that seem to hold to the contrary (*Merchants' National Bank* v. *National Bank of Commonwealth,* 139 Mass. 513; *Northampton National Bank* v. *Smith,* 169 Mass. 281), still we may admit that the rule declared by Chief Justice Taney is correct in cases where there is nothing on the draft to give notice that the drawee does not pay out of funds of the drawer in his hands. But that is not the case here. The bill of sale on the back of the draft was notice to every one taking it that the drawee was paying, or would pay, not upon the funds of the

drawer in his hands, but out of his own funds, upon the belief that there was a valid bill of sale and a transfer of the property described therein. The form of the draft was notice to the bank that the drawee would not pay unless the bill of sale and the signature thereto were genuine, and it should have taken the usual precautions to ascertain that they were genuine before parting with its money. It obtained this money, not by presenting the drafts alone, but by presenting them in connection with these forged bills of sale. The drawee was ignorant of the forgery, and the case, as we think, comes within the general rule that one who has paid money under a mistake of fact may recover it. *Northampton National Bank* v. *Smith,* 169 Mass. 281; *Merchants' National Bank* v. *National Bank of Commonwealth,* 139 Mass. 513; *Star Fire Ins. Co.* v. *New Hampshire Bank,* 60 N. H. 442; *Carpenter* v. *Bank,* 123 Mass. 66.''

(1)   Appellants say the case just quoted from should control here, and that upon the authority of that case a verdict should have been directed in their favor. But we think this case is distinguishable from that one on the facts. It is true, as stated in that opinion, that, in the usual course of business, the drawee has the right to suppose that the collecting bank has taken proper precautions to ascertain the genuineness of the signatures upon which it expects to make the collection and that, in the usual course of business, the presentation of the draft for payment is, in effect, a representation upon the part of the bank of the genuineness of such signatures, but here the jury might have found, if the statement of Thompson was accepted, that he knew nothing about the transaction which was consummated by the draft, and that he had made no inquiry as to the genuineness of these bills of lading, and that Spencer & Co. did not rely, and had no right to rely, upon any representation, either expressed or implied, by Thompson that the bills of lading were genuine. But, upon the contrary, the jury might have found from the evidence that Spencer & Co. acted upon their own knowledge and upon their own opinion of the

validity of these bills of lading, and that they had no right to assume that Thompson had made any inquiry upon that subject, and that they had assured Thompson that they would pay this draft when it was presented to them with the bills of lading, then in Farrin's possession, attached. Of course, Spencer's evidence is to the effect that he agreed to honor the draft only upon the condition that there should be attached to it, when presented, bills of lading for three carloads of corn, and that there were no bills of lading attached when the draft was presented.

(2) We should affirm this case but for the action of the court in giving the sixth instruction set out above, which we think was prejudicial under the issues made. It was shown without dispute that neither appellants nor appellee knew anything about the invalidity of these bills of lading until about the 14th of March, on which day appellants promptly wrote appellee advising it of that fact. This would certainly not be such delay as would defeat recovery if appellants were otherwise entitled to recover. It is urged, however, that this instruction was not prejudicial because the jury must necessarily have found that there was no delay in notifying the bank. But we can not say that this is true. Upon the contrary, appellee argues here, as was no doubt done before the jury, that there was unnecessary delay in discovering the fact of the forgery; that appellants could have ascertained in thirty minutes a fact which they did not learn for nearly thirty days, by a simple inquiry at the railroad office in the city of Jonesboro.

For the error in giving this instruction, the judgment is reversed and the cause remanded.

Justices HART and KIRBY, dissent.

### DISSENTING OPINION.

HART, J. The undisputed facts in this case bring it squarely within the doctrine announced in *Goetz v. Bank of Kansas City*, 119 U. S. 551. There the court held:

1. "The acceptor of a bill of exchange discounted by a bank with a bill of lading attached which the accep-

tor and the bank regard as genuine at the time of the acceptance, but which turns out to be a forgery, is bound to pay the bill to the bank at maturity.

2. "The bad faith in the taker of negotiable paper which will defeat a recovery by him must be something more than a failure to inquire into the consideration upon which it was made or accepted, because of rumors or general reputation as to the bad character of the maker or drawer."

In that case the facts were precisely similar to the facts in the case at bar and Mr. Justice Field, speaking for the court, said: "Under these circumstances, it is not surprising that, when the drafts on the merchants in Milwaukee were presented for discount, the bank made no inquiry as to the genuineness of the bills of lading attached to them. A bank in discounting commercial paper does not guarantee the genuineness of a document attached to it as collateral security. Bills of lading attached to drafts drawn, as in the present case, are merely security for the payment of the drafts. The indorsement by the bank on the invoices accompany some of the bills, 'for collection,' created no responsibility on the part of the bank; it implied no guarantee that the bills of lading were genuine; it imported nothing more than that the goods, which the bills of lading stated had been shipped, were to be held for the payment of the drafts, if the drafts were not paid by the drawees, and that the bank transferred them only for that purpose. If the drafts should be paid, the drawees were to take the goods. To hold such indorsement to be a warranty would create great embarrassment in the use of bills of lading as collateral to commercial paper against which they are drawn." To the same effect, see *Hoffman* v. *Bank of Milwaukee,* 12 Wallace 181.

In the case of *Varney* v. *Monroe National Bank,* 119 La. 943, 13 L. R. A. (N. S.) 337, a draft was discounted with a bill of lading attached. It was genuine and was drawn on plaintiff with his authorization, and was paid by him. The bill of lading was a forgery. Plaintiff sued

the defendant to return the amount on the ground that it was paid in error and that the defendant was liable for the error. The court held that what mistake there was, was plaintiff's, for trusting the dishonest drawer of the draft, who annexed to it a forged bill of lading.

In the case of *Exchange National Bank* v. *Coe,* 94 Ark. 387, we announced the policy that the decisions of the Supreme Court of the United States should be accepted as controlling in matters relating to commercial law where there is no statutory rule or decision of this court to the contrary. This course tends to make uniformity in the decisions of such questions.

I do not think the principles decided in the case of *LaFayette* v. *Merchants' Bank,* 73 Ark. 561, are opposed to the decisions above referred to; but, on the contrary, I think the principles of law there announced are recognized. The facts in the case of *LaFayette* v. *Merchants' Bank* are essentially different from the facts in the case before us. There LaFayette & Bro., dealers in live stock, entered into an agreement with one Whitlock by which, under certain conditions, they were to advance money for the purchase of cattle. They prepared and had printed a blank form of draft to be drawn on them for the price of the cattle and provided that on the back of the draft there should be a blank for a bill of sale conveying the cattle to LaFayette & Bro. Thus it will be seen that there was a printed form of draft and bill of sale on the back of it and all that Whitlock had to do was to fill in the name of the payee and the amount of money in the face of the draft and a description of the cattle in the printed bill of sale. Whitlock forged the name of the payee in the draft and also forged a bill of sale from him and forged the indorsement of the name of the vendor on the draft. The court laid stress on these facts and held that, under the circumstances, the form of the draft was notice to the bank that the drawee would not pay unless the bill of sale and the signatures thereto were genuine and held that the lower court erred in directing a verdict for the Merchants' Bank, which had discounted the draft.

In the case before us the draft was genuine. The drawer wrote it out in the bank at the time it was discounted. The bill of lading for the corn was then attached to it. Spencer & Co. fully understood that there was no corn connected with the bill of exchange except that supposed to be covered by the bill of lading. In the conversation over the telephone with the cashier of the bank, they told him they would pay the drafts if the amounts were correct, and if the drafts were attached to the bill of lading. During the transaction they took down the weight of each car and the number of pounds of corn and figured it out so as to have the amount of corn correct. Their only concern was that the amount of corn in the bill of lading should be correct.

After a careful examination I do not find any fact or circumstance which indicated that the bank had any notice that the bill of lading was not genuine. The bills of lading were on the blank form used by the railroad company. It is true that a subsequent investigation showed that the place from which the corn purported to be shipped was not on the line of the railroad company, but there is no fact or circumstance in evidence that the bank knew of this fact and I do not think a jury might have inferred that the bank had any warning whatever that the bill of lading was not genuine.

Therefore, I think the court should have directed a verdict in favor of the bank based upon the well-settled rule that the consideration in a bill of exchange, as between the drawer and the drawee, does not affect the rights of a *bona fide* endorser for value.

Kirby, J., concurs in the dissenting opinion.