## In re SMITH, LOCKHART & CO.

### TRUSTEE IN BANKRUPTCY v. MERCANTILE TRUST & DEPOSIT CO.

(District Court, D. Maryland. December 17, 1924.)

**1. Banks and banking** &#8258;142—**Bankruptcy trustee held not entitled to recover fund which had legally vested in another before bankruptcy.**

Where a bank received and credited to a depositor a check given by another depositor which had funds sufficient to pay it, and which, so far as the bank knew, was solvent, though in fact insolvent, the transaction between the parties was completed and the bank was required to apply so much of the drawer's funds as necessary to the payment of the check, and the fact that it failed to do so does not entitle the trustee of the drawer, on its subsequent bankruptcy, to claim the fund.

**2. Banks and banking** &#8258;320—**Bank held to have made illegal disbursement of funds of bankrupt estate.**

On the day of bankruptcy but before the filing of the petition and without knowledge of its insolvency, the bank in which bankrupt was a depositor received checks given by it through the clearing house and charged the same to its account. By the clearing house rules it had the right to return the checks at any time before 12 o'clock, and by custom the time limit might be waived and return permitted up to the time of closing of the exchange for the day. Learning of bankrupt's embarrassment and fearing that it might not have sufficient funds of bankrupt because of uncollected checks deposited, the bank sought and received permission to return the checks and duly credited them to bankrupt's account. This was after 12 o'clock and after filing of the petition. Later, finding that it had sufficient funds, the bank refunded the amount of the checks to the presenting banks. *Held*, that the waiver of the time limit by the presenting banks and acceptance of return of the checks put the parties in the same position as when the checks were first presented; that the bank was not legally bound to make the refund and was without right to do so from funds which then belonged to the bankrupt estate.

**3. Banks and banking** &#8258;320—**Time of payment of checks presented through clearing house.**

In contemplation of law, payment of checks presented through a clearing house has not been made until expiration of the time within which,

under the clearing house rules, the presenting banks are bound, on demand, to accept their return.

**4. Banks and banking** &#8258;319—**Clearing house rules may be waived.**

The rules made by the members of a clearing house for their mutual convenience and protection may be waived by the bank which they aim to protect.

**5. Banks and banking** &#8258;319—**Clearing house rules may have a bearing on rights of outside parties.**

While the rules of a clearing house are not of their own force binding on persons not members, such rules and the practice under them may have a bearing on rights of third persons.

In Bankruptcy. In the Matter of Smith, Lockhart & Co., bankrupt. Petition of the trustee in bankruptcy against the Mercantile Trust & Deposit Company for an accounting. Credits of accounting bank determined.

J. Purdon Wright and Reuben Oppenheimer, both of Baltimore, Md., for trustee.

Venable, Baetjer & Howard, of Baltimore, Md., for Mercantile Trust & Deposit Co.

ROSE, Circuit Judge. Adjudication in bankruptcy of the stock brokerage firm of Smith, Lockhart & Co., herein called the bankrupt, was made upon a petition filed at 12:30 in the afternoon of August 9, 1922. Subsequent investigation ·demonstrated that its insolvency was of long standing, but before the day upon which legal proceedings were instituted that fact does not appear to have been known to any one outside the bankrupt's offices. It banked with the Mercantile Trust Company, hereinafter styled the Mercantile. It is not claimed that at any time prior to the day on· which the petition in bankruptcy was filed the Mercantile questioned the financial soundness of its customer.

At the close of business on August 8th, the books of the Mercantile indicated that it held on deposit $55,750.94 of the bankrupt's money. On the morning of the 9th, Jos. P. Hooper & Co., another customer of the Mercantile, deposited with it a check of the bankrupt's and in· favor of the depositor for $9,084.46. This amount was entered in the Hooper passbook as cash and was at once credited to its account on the Mercantile's ledger. The Mercantile over its counter cashed a check of the bankrupt's for $500 in favor of one not connected with this controversy. In the usual course of

business, there had that morning been presented through the clearing house, to the Mercantile, more than a score of checks of the bankrupt's aggregating $20,078.17. In accordance with custom, all these were at once duly charged by the Mercantile to the bankrupt's account. The aggregate of the Hooper check, the check cashed over the counter, and these clearing house checks was $29,662.63, and the bankrupt's apparent balance with the Mercantile was thus reduced to $26,087.81.

Up to this time the Mercantile had no hint that the bankrupt's business was not going on as usual, although, unknown to it, much had happened. At or shortly before 9 o'clock that morning, representatives of the New York Stock Exchange presented themselves at the bankrupt's office, and under orders of the Exchange removed the stock ticker therefrom. This was done before the senior members of the bankrupt firm reached their place of business. So soon as they learned what had taken place, they went to the office of their lawyer and after a conference with him, they, about 11:30, caused the Mercantile to be telephoned that the ticker had been taken out and not to pay out any more money than they had in the account or more than they had collected, or words to the same general effect. The Mercantile thereupon summoned its counsel. He responded immediately and reached the Mercantile at 11:40. He was told what his client knew. He naturally assumed that the bankrupt might be on the verge of failure and busied himself to find out how it stood with his client. Before 12 o'clock he learned that while the apparent credit balance of the bankrupt with the Mercantile exceeded $26,000, that would be true only if the checks deposited by the bankrupt and provisionally accepted by the Mercantile as cash were honored. Without concerning himself as to the possibility that payment might be stopped upon a number of checks on out of town points for comparatively small amounts, as in fact proved to be the case as to some of them, he and the Mercantile concentrated their attention on two checks amounting in the aggregate to $43,500, which had been credited to the bankrupt. There were some special reasons to fear that one or both of these might not be paid. If neither of them was, the account of the bankrupt with the Mercantile would have been overdrawn by more than $17,000.

At that time the rule of the clearing house permitted a member bank to return a check charged to it at the morning clearing before noon on that day and provided that upon request made before 12, the time for return should be extended to 1. Instructions were given to some of the Mercantile's employees to use the telephone to secure an extension to that hour. These instructions were misunderstood and were not acted upon. Counsel further advised that the check of the bankrupt which had been credited to the Hooper Company should be charged back to the latter.

It was well after 12, and perhaps as late as 1, before he heard that nothing had been done with reference to the return of the checks of the bankrupt which that morning had come from the clearing house. In spite of the clearing house rule which in terms limited the right of return to 12, or to 1, when the extension had been seasonably requested, it is in evidence that the member banks were usually willing to waive its strict application and to accept return at any time before the close of business hours for the day. When a check is returned, either within or after the time fixed by the rules, it is the practice of the returning bank to attach to it a slip explaining the reason why it has been sent back. Such slips have printed upon them some 16 or 17 of the reasons for return most frequently occurring in practice. The one relied upon in the particular case is indicated by checking. Two of these reasons which appear in juxtaposition near the end of the slip are, "Drawn against uncollected funds," and, "Not sufficient funds according to our books." By some error or misunderstanding, the Mercantile checked the second of these on the slip it sent out with the return checks. That was not an accurate statement, for, as already stated, there were sufficient funds on the face of the Mercantile's ledgers to meet all these checks. The Mercantile could have appropriately stated that the checks had been "drawn against uncollected funds." It is true that by the time the checks were sent back the funds had been collected, but that fact was not then known to the Mercantile, in spite of the efforts that it had been making to obtain information on that very point. Whether a depositor's account is sufficient to meet a check drawn by him against it often depends upon whether some checks or drafts he has deposited have been or will be paid.

The bank which has his account may frequently be unwilling to honor his check until it knows whether the payment has been made or not. In view of the frequency with which in practice returns must be made upon this ground and that there is among the many reasons printed on the slip none more appropriate than the one, "drawn against uncollected funds," it would appear that in the understanding of the banks it covers such a case as that with which we are concerned. Considerations of space dictate that on the blanks as few words as possible should be used, and therefore the reasons are often indicated rather than fully stated.

The Mercantile's request to accept the return was acceded to by all but one bank, the National Union, which refused to take back two checks for an aggregate of $7,705.-27. The total amount returned by the other banks to the Mercantile footed up $12,-372.90. On subsequent days, and after the Mercantile knew of the proceedings in bankruptcy and the appointment of a receiver for the bankrupt, it repaid this sum to the various banks which after 1 o'clock had accepted the return of the clearing house checks. In these proceedings the trustee in bankruptcy seeks to hold the Mercantile for the Hooper check of $9,084.46 and for the $12,372.90 thus paid out by it after it knew of the appointment of the receiver by the court in bankruptcy.

[1] In the Hooper passbook, there was a general warning given by the Mercantile to its customers that it would not be "bound to use more than ordinary diligence to make collection of any item left with it for collection or by it passed to the credit of any customer, * * * and in case of loss in any item for failure to collect * * * the trust company shall be entitled to charge such loss back to its customer or to collect the same from the customer at once." But there was no failure to collect. The Mercantile had in hands funds of the bankrupt sufficient to pay the check when it was presented, and due diligence required it to apply a sufficient portion of them to its payment. At that time it did not know, or suspect, that the bankrupt was embarrassed. The transaction as between it and the Hooper Company was closed when it credited the amount of the check to the latter subject to its right to call for a refund if it should subsequently turn out that it had been mistaken, as it was not, in supposing that at the time it had in hand moneys of the bankrupt adequate to the payment.

The legally unsustainable attempt of the Mercantile to charge back the amount of the check to the Hooper Company cannot help the trustee. The trustee did not change his position because the Mercantile tried to alter its. Disappointed hopes are not in themselves sufficient to support an estoppel. The amount of the bankrupt's check presented by the Hooper Company is a valid credit as against the trustee's claim upon the Mercantile.

[2] The answer to the question as to whether the Mercantile is entitled to charge against the bankrupt's account the amount it paid to the various clearing house banks, after it knew of the appointment of the receiver, depends upon other considerations. The petition in bankruptcy was not filed until after the hour at which, according to the literal wording of the clearing house rule, the Mercantile's right to return the checks had expired. It is therefore not necessary to consider whether the Mercantile, had it learned before 12 o'clock that a petition in bankruptcy had been filed, would have owed the bankrupt estate a duty to exercise reasonable diligence to return the checks.

[3] On the other hand, the Mercantile does not claim that, after it knew the court in bankruptcy had taken charge of the estate of the bankrupt, it had any right to use the funds of the latter in its possession to pay claims of third parties. In short, it admits that if it had not before the appointment of the receiver paid the checks in controversy or made itself personally liable for that payment, it cannot charge against the funds of the bankrupt the payments it made after it had knowledge of the appointment of the receiver. It does, however, contend that under clearing house rules it had once paid the checks. It is true that it did secure their refund from the banks which held them, but it argues that they made such refunds in reliance upon its inaccurate representations, and that consequently they had the right to demand that it should return the money and that they did. The Mercantile calls attention to the holding of Judge Dallas that, under circumstances similar to those with which we are here concerned, the checks had been finally paid when the bank upon which they were drawn received them from the clearing house and charged them to its customer, and it made no difference, so far as the trustee was concerned, that under the rules of the clearing house the Mercantile until 12 o'clock had the absolute

right to return the checks to the banks which had presented them. National Union Bank v. Earle (C. C.) 93 F. 330. It, however, concedes that the great weight of authority is that, in contemplation of law, payment has not been made until after the expiration of the time within which the presenting banks were bound upon demand to accept the return of the checks. Henry Hentz v. National City Bank, 159 App. Div. 743, 144 N. Y. S. 979; Stuyvesant Bank v. National Mechanics' Banking Association, 7 Lans. (N. Y.) 197; Merchants' National Bank v. National Bank of Commonwealth, 139 Mass. 513, 2 N. E. 89; Columbia Knickerbocker Trust Co. v. Miller, 215 N. Y. 191, 109 N. E. 179, Ann. Cas. 1917A, 348; Sneider v. Bank of Italy, 184 Cal. 595, 194 P. 1021, 12 A. L. R. 993; Eastman Kodak Co. v. National Park Bank (D. C.) 231 F. 321, affirmed by the Circuit Court of Appeals for the Second Circuit, 247 F. 1002, 159 C. C. A. 662; National Bank of Baltimore v. Drovers' & Mechanics' National Bank, 143 Md. 168, 122 A. 12, 30 A. L. R. 1019.

[4, 5] It is well settled that the rules made by members of the clearing house for their mutual convenience and protection may be waived by the bank which they aim to protect. National Bank of Baltimore v. Drovers' & Mechanics' National Bank, supra, and they are not of their own force binding upon persons not members of the clearing house. National Exchange Bank v. Ginn & Co., 114 Md. 181, 78 A. 1026, 33 L. R. A. (N. S.) 963, Ann. Cas. 1914C, 508; Merchants' National Bank v. National Bank of Commonwealth, supra; Overman v. Hoboken City Bank, 30 N. J. Law, 61; Stuyvesant Bank v. National Mechanics' Banking Association, supra. The latter doctrine, however, does not imply that such rules or the practice under them may not have a bearing even where other parties are involved. In many such cases the result depends upon the time at which the check was paid, and that in its turn is often fixed by the mutual understanding of the bank which is said to have made the payment and the bank to which it has been made. To find out what that understanding was, it is frequently necessary to look to the established usage of business between them of which the rules for the government of their conduct, which they had united to make, will usually be persuasive evidence, though they will not always be conclusive. So far as concerns outsiders, at least, the decisive thing is what the members do, rather than what they say they expect to do. There is no dispute that, both by the rules and by the course of business under them, a check presented through the clearing house is not considered paid until after 12 o'clock. Up to that time, the bank upon which it is drawn has so far as the presenting bank is concerned the absolute right to return it. It is legally immaterial what its reasons for so doing may be, and it therefore makes no difference that it assigned a reason which had no foundation in fact. Sneider v. Bank of Italy, supra.

As the rules may be waived, it would seem to be equally clear that in the absence of some misrepresentation or concealment having the effect of misrepresentation, a refund actually made by the presenting bank in compliance with a request made after 12 o'clock would put each of the two banks in the position in which it was when the check was first presented. Up to this point, I do not understand there is any serious difference between the parties either as to the law or as to the facts. The issue as joined between them is upon the contention of the Mercantile that it was entitled to pay out the money it did and when it did, because the waiver of the presenting banks was made in reliance upon an untrue statement it made to them. It does not say that it intended to deceive anybody, nor is there the slightest reason to suppose that it did. Even were the fact otherwise, the ordinary rule that nobody may base a recovery upon his own fraudulent acts would scarcely apply. If at 12 o'clock on the day in question the silence of the Mercantile had given the presenting banks the absolute right to treat the checks as paid and no attempt to return had thereafter been made, the bankrupt estate would be bound by such payments, made as they were by the Mercantile in the ordinary course of business upon the orders of the bankrupt as evidenced by the checks and without the Mercantile's having any reason to believe that they should not be honored. It is true, as is already pointed out, the presenting banks might, if they had chosen, have accepted a return of the checks and refunded the money received for them, and if the decision to do so was not the result of some misrepresentation, concealment, or mutual mistake, the refunds would be binding upon the banks making them and would in effect inure to the benefit of the bankrupt estate. On the other hand, if the presenting bank made the refund under circum-

stances which justified it in saying that its action was not binding upon it and in consequence may call upon the Mercantile to refund, the Mercantile would have no choice other than to comply. In that event, the state of the account between it and the bankrupt would have been as it was before the presenting banks had taken the checks back. The fact that the Mercantile had temporarily succeeded in getting the money into its hands would, after it had been compelled to surrender it again, give the bankrupt estate no rights it had not before had. It would make no difference what methods the Mercantile had used to induce the presenting banks to repay unless as a result of their temporary success, the bankrupt estate had changed its position as it did not do.

The issue between the Mercantile and the trustee is in reality a narrow one. Could the presenting banks have compelled the Mercantile to make the refunds it did? If so, the trustee is not entitled to complain that they were made; but if the Mercantile paid out the money when the law would not have required it to do so, it cannot set up such payments against the trustee. The misrepresentation which it is claimed the Mercantile made to the presenting banks was that, according to its books, it did not have sufficient funds to meet the checks. Literally this was not true. On the face of its ledgers it had more than enough to pay them all. The real reason why it sent them back was that they were drawn against funds which it feared were as yet uncollected and might always remain so. In view of the financial clouds which were hanging over the bankrupt, the Mercantile did not wish to take any chances.

All but two or three of the numerous witnesses for the presenting banks produced by the Mercantile testified in open court. From listening to them, I am convinced that the difference between a statement that the checks were returned because the Mercantile's books showed insufficient funds to meet them, and the statement that they were sent back because drawn against uncollected funds, was one which no one of the presenting banks considered material. Those who actually complied with the Mercantile's request would have done so whichever of the two explanations had been given. Indeed, all the real difference between the two statements is that one says, "It looks like we have not the money here," and the other says, "We fear that it may turn out

that we do not have it." Upon the evidence before me, I do not believe that the presenting banks could have legally compelled the Mercantile to make the refunds it did. I am furthermore persuaded that, no matter how peremptory may be the wording of the clearing house rule, the actual practice of its member banks is to make refunds whenever checks are returned at any time within the business day upon which they were presented through the clearing house, unless before such return is requested, they have in some way committed themselves to their own customers or have received some special information which leads them to believe that such a return might expose them to loss.

As some of the witnesses in substance expressed it, mistakes and delays are so common and are so often made by every bank that it is not to the interest of any of them to insist upon too literal a compliance with the clearing house rule. It is evident upon the testimony that returns after 12 o'clock are common, and that the rule is to accept them. Doubtless, a bank may decline to do so, and declinations are made, but they are very few in proportion to the total number of checks tendered back. To accept such returns is so nearly a matter of course that in one large bank, there are as many as 15 or 20 officers or employees who have authority to receive them. I cannot therefore find that there is any ground upon which the presenting banks could have compelled the Mercantile to make the repayments to them it did, and I therefore must hold that it is not entitled to charge them against the funds of the bankrupt in its possession at the time of the appointment of the receiver.

I have not lost sight of the argument of the Mercantile that it was legally bound to make the refunds, because when it returned the checks to the presenting banks, it did not give them the information which it had and to which they were entitled in view of what it was asking them to do and of the relation in which it stood to them. The only fact it then knew was that the bankrupt's stock ticker had been taken out by the order of the New York Stock Exchange. Such action might have been taken for many reasons other than the real or suspected insolvency of the bankrupt, and very likely was. There was no occasion for the Mercantile to say anything about it apart from the possible or probable effect upon the fortunes of the bankrupt. It is, how-

ever, unquestionably true that in consequence of what the Stock Exchange had done the Mercantile feared that the bankrupt might not be able to make good any overdrafts upon its account; but that much the Mercantile told the presenting banks when it sent back the checks. It said to those banks, "We ask you to take the checks off our hands because we have not sufficient funds to meet them," which was, of course, in effect a statement that it was not willing to permit any overdrafts upon the bankrupt's account.

The bankrupt had been in business in Baltimore for some years, and during that time had banked with the Mercantile. It was well known in the city. It had been believed to be financially sound. Many of the checks which the Mercantile was seeking to return were for comparatively small amounts, averaging about $600 each. The return was made after 1 o'clock. Under such circumstances, what the Mercantile did itself told the other banks all that it then knew. It warned them that something had happened which made the Mercantile suspect that it would lose money if it held the checks and with such information the banks saw fit to do what the Mercantile requested.

This conclusion would seem to make the Mercantile pay heavily because it did for its fellow bankers what it would have had them do for it had the circumstances been reversed. In almost all bankruptcies, there are many conflicting equities. Notably, this is true as in the instant case, when disaster overtakes stock brokerage concerns. There are here thousands of creditors, many of whom never intended to become such. Their claims aggregate millions, and they will receive less than 10 cents on the dollar. The adjustment of such equities, as far as they are capable of adjustment at all, is among the most difficult problems which the courts are called upon to solve. One who, with knowledge that the estate is in bankruptcy, attempts their solution, does so at its peril.