# MARCH 1869. 28<u>1</u>

Memorandum. Merchants' National Bank *v.* National Eagle Bank.

## MERCHANTS' NATIONAL BANK *vs.* NATIONAL EAGLE BANK.

The rules of an association of banks organizing a clearing house for the purpose of effecting exchanges between themselves at one time and one place daily, and the payment at the same place of the resulting balances, fixed a time before noon for making exchanges at the clearing house, and a time between noon and one o'clock for paying balances there. The practice under the rules was for the exchanges and payments to be made according to tickets accompanying vouchers presented for exchange, and not from an examination of the vouchers themselves in detail. And by further rules it was provided that errors in the exchanges should be adjusted directly between the banks; and that, whenever checks which were not good should be sent through the clearing house, the banks receiving them should return them to the senders as soon as it should be found that they were not good, "and in no case shall they be retained after one o'clock." *Held*, that the payment of a check through the clearing house was provisional until one o'clock, to become complete only if the check was retained after that hour; and that, if by any mistake of fact a check so paid but not good was retained until after one o'clock, the payment of it was to be treated as a payment made under a mistake of fact, to the same extent and subject to the same right of reclamation as if it had been made without the intervention of the clearing house.

CONTRACT to recover the amount of a check drawn on the plaintiffs by John R. Williams, payable to the order of Hubbard Brothers, and by them indorsed and deposited with the defendants. At the trial in the superior court, before *Ames*, C. J., the material facts appeared as follows:

The plaintiff and defendant banks were members of the Boston Clearing House Association, which was formed by banks in Boston "for the purpose," as expressed in the preamble of their articles of association, "of effecting a more perfect and satisfactory settlement of the daily balances between them." In the second section of the articles signed by the banks constituting

the association, it was set forth that " the objects of the associa-
tion are the effecting, at one place and one time, of the daily
exchanges between the several associated banks, and the pay-
ment, at the same place, of the balances resulting from such
exchanges." By the eleventh section it was provided that " the
hour for making the exchanges at the Clearing House shall be
ten o'clock before noon, each day ; " " at twelve o'clock, noon,
the debtor banks shall pay to the manager at the Clearing House
the balances due from them respectively ; " and " at half past
twelve o'clock after noon the creditor banks shall receive from
the manager, at the same place, the balances due to them re-
spectively, provided all the balances due from the debtor banks
shall then have been paid to him." The thirteenth section pro-
vided that " errors in the exchanges, and claims arising from the
returns of checks or other cause, are to be adjusted directly be-
tween the banks which are parties therein, and not through the
Clearing House ; " and a subsequent section was as follows :
" Whenever checks are sent through the Clearing House which
are not good, they shall be returned, by the banks receiving the
same, to the banks from which they were received, as soon as
it shall be found that said checks are not good ; and in no case
shall they be retained after one o'clock."

It was the usage for each bank " each morning, at ten o'clock,
to have at the Clearing House, for the purpose of effecting set-
tlements with other banks, all the checks and other demands,
such as bills, &c., it had received against all the other banks
during the preceding day, making them up into separate bun-
dles for each bank, with a ticket containing the items and aggre-
gate of the contents of each bundle; the settlement was made
at the Clearing House upon the footings of these tickets, with-
out regard to the fact whether the contents of the bundle were
correctly ticketed, or formed good claims against the bank
charged with the contents of the bundle as per ticket; and in
from ten to fifteen minutes past ten o'clock the messenger from
each bank was able to receive and take to his bank all the
claims of the other banks against it." Each bank was known
at the Clearing House by a particular number.

The plaintiffs' evidence showed that Hubbard Brothers deposited the check with the defendants on Saturday, June 15, 1867, but, as the banks were all closed on Monday, the 17th, it was not, and could not be, sent to the Clearing House until Tuesday, June 18. In the forenoon of the last named day the defendants sent it to the Clearing House in their bundle of demands against the plaintiff bank, and the amount of it was allowed to them in their settlement with the Clearing House later in the day. At about quarter past ten o'clock, the plaintiffs' messenger returned from the Clearing House and delivered to their paying teller the various bundles of demands against them; and the teller, with an assistant, proceeded to open and examine them in the regular course of business of the plaintiffs; ascertaining whether the contents of each bundle corresponded with the ticket, and whether each check was in fact drawn upon the plaintiffs and was properly signed and indorsed; marking the checks with the respective numbers of the banks which sent them to the Clearing House; and finally assorting them into three piles, and giving each pile to a bookkeeper to examine whether the drawers of the checks contained in it had funds deposited to meet the amounts drawn for. It was nearly twelve o'clock, when the teller finished his examination so far as to deliver the piles of checks to the bookkeepers; and at half past twelve, the check in question, with three others, each drawn by Williams, and sent to the Clearing House from four different banks, were returned to him by the bookkeepers as not good, there being no funds to meet them. At a quarter before one o'clock, and "as soon as he could in the performance of his other duties," the teller handed the four checks to the messenger, with directions to return them to the banks, with whose numbers they were marked, as not good, and to collect the amounts of them from those banks. The messenger made a mistake as to the number on one of the checks, went to the wrong bank with it, and was obliged to return to the plaintiffs' banking-house in order to ascertain the true number. In consequence of this mistake, it was from five to seven minutes after one o'clock when he presented the check in question at the defendants' banking-

house, where payment of it was refused by the defendants on the ground that it had not been presented before one o'clock.

The defendants asked the judge to rule that the plaintiffs could not maintain their action, "upon the ground that, on the plaintiffs' own showing, the check was not presented to the defendants until after one o'clock of the day upon which it was left at the Clearing House, and by the articles of association the defendants were not liable to refund the amount of a check not good, unless it was presented to them at or before one o'clock of the day when it was sent to the Clearing House · and that the requirements in regard to the return of checks were to be availed of by the depositing bank as well for the protection of its depositors as for itself." But the judge ruled "that the Clearing House Association was an agreement between the banks for their own benefit and guidance; that, if the plaintiffs delivered the check to a messenger before one o'clock, to be returned to the bank depositing it, in the usual course of their business, and with time sufficient, in the absence of any accident or mistake, to reach the depositing bank by one o'clock, it would be a compliance with the vote, especially in view of the language of the vote that the bank should not retain the checks after one; but that, irrespective of this peculiar wording of the vote, the failure of the bank to return a check by one o'clock could be a defence to the depositing bank only to the extent that such bank was injured by such delay; and that, if the bank could show that it had changed its position after one, in consequence of the nonreturn of said check, the vote of the Clearing House would protect it."

Under these rulings, the defendants declined to offer evidence; and a verdict was taken for the plaintiffs, and the case reported for the revision of this court.

*C. B. Goodrich*, for the defendants.

*S. Bartlett & D. Thaxter*, for the plaintiffs.

COLT, J. This action is brought by the plaintiffs to recover the amount of a check drawn upon them and paid by them through the agency of the Boston Clearing House, there being no funds of the drawer in their hands at the time of the pay ment.

It is well settled by recent decisions that money paid to the holder of a check or draft drawn without funds may be recovered back, if paid by the drawee under a mistake of fact. And though the rule was originally subject to the limitation that it must be shown that the party seeking to recover back had been guilty of no negligence, it is now held that the plaintiff in such case is not precluded from recovery by laches in not availing himself of the means of knowledge in his power. It is otherwise if the money is intentionally paid without reference to the truth or falsehood of the fact, and with the intention that the payee shall have the money at all events. *Appleton Bank* v. *McGilvray*, 4 Gray, 518. *Kelly* v. *Solari*, 9 M. & W. 54. *Townsend* v. *Crowdy*, 8 C. B. (N. S.) 477. This right to recover back the money, however, will in no case be permitted to prejudice the payee who has suffered any damage or changed his situation in respect to his debtor by reason of the laches of the plaintiff, or his failure to return the check within a reasonable time.

It is plain, in the case here presented, that if the plaintiffs had paid this check at their own counter under a mistake of fact, they could have maintained this action to recover it back. . Is there anything in the manner in which the payment was in fact made, or in the relation of the parties to each other as members of the Clearing House Association, which prejudicially affects this right?

It is declared by the articles, which were signed by the plain· tiff and defendant banks, to be the object of the association to effect at one time and place the daily exchanges between the several associated banks, and the payment of the balances resulting from such exchanges. An early hour is fixed for making these exchanges, and a later time in the day for the receipt and payment of balances from the debtor and creditor banks. These settlements are made, not from an examination in detail of the vouchers presented, but from memoranda and tickets accompanying them. And any mistakes resulting from this mode of settlement are to be adjusted directly between the banks which are parties therein. It is further provided that " whenever checks

are sent through the Clearing House which are not good, they shall be returned, by the banks receiving the same, to the banks from which they were received, as soon as it shall be found that said checks are not good; and in no case shall they be retained after one o'clock." Under this arrangement, the payment required of the Clearing House to a creditor bank, upon a check presented, must be regarded as only provisional until the hour of one o'clock, to become complete only in case the check is not returned at that time. And if by any mistake of fact the return of the check is not so made, then, as between the two banks, it is to be treated as a payment made under 'a mistake of fact, precisely to the same extent, and with the same right to reclaim, which would have existed if the payment had been made by the simple act of passing the money across the counter directly to the payee on the presentation of the check. The manifest purpose of the provision is, to fix a time at which the creditor bank may be authorized to treat the check as paid, and be able to regulate with safety its relations to other parties.

We cannot adopt the theory that a failure to present a bad check, before the time named, to the bank sending it through the Clearing House, works an absolute forfeiture, and is in itself a perfect bar to any action to recover the amount of such check. The whole arrangement, in all its provisions and declared purposes, is to be construed together. And the law will not construe any portion so as to subject parties to a penalty or forfeiture of their rights, where other reasonable interpretation can be given which will give effect and consistency to the whole. The parties have in terms affixed no penalty or forfeiture to the stipulation under consideration, and a failure to comply with its terms must leave the parties in the same position and precisely as they would stand when a payment is made under a mistake of fact in the ordinary way. After one o'clock, the defendants, upon the failure to return the check, had the right to consider it paid, and to treat it so in their dealings with others. The report finds that the delay in its return was occasioned by a mistake or the part of the messenger, a mistake which was quite as much a mistake of fact as if it had been produced by the false time of a

clock which was relied on. And no suggestion is made that there has been any change of circumstances, after the time when the defendants had a right to treat the check as paid, and before it was returned, which would now subject the defendants to damage or loss, and render it unjust for the plaintiffs to recover.

We have considered the case as if the agreement required the return of the check to the bank from which it was received before or at one o'clock; but it will be noticed that the stipulation is, that the check shall in no case be *retained* after one o'clock. If it were necessary to save a penalty or a forfeiture, it might be held that the delivery of it to a messenger before one o'clock, to be returned to the bank depositing it, with sufficient time, in the absence of any accident or mistake, to reach the bank before that hour, would be a compliance with its terms, although it was not in fact delivered until some minutes after.

*Judgment on the verdict for the plaintiffs.*