## Manufacturers' National Bank of Baltimore vs. William H. Swift.

*Banks—Presentation and Payment of Check—Effect of Payment by Mistake, when the Drawer has no funds.*

It is the duty of a Bank to know the state of its depositor's account, and if it makes a mistake in this respect it must abide the consequences.

The presentation of a check is a demand for payment. If it is paid, all the rights of the payee have been satisfied, and he is not entitled to ask any questions.

In the absence of fraud on the part of the holder, the payment of a check by a Bank is regarded as a finality, and the fact that the drawer has no funds on deposit, will not give the Bank any remedy against the holder.

Appeal from the Circuit Court of Baltimore City.

The appellant filed a petition in this case, asking that the decree against the appellee and itself might be entered to its use; and that said co-defendant might be directed to make good to it the amount of said decree, which it had paid into Court. The Court (Brown, C. J.,) passed an order dismissing said petition, and the petitioner appealed. The facts are stated with sufficient fullness in the opinion of the Court.

The cause was argued before Miller, Stone, Robinson, Irving, Bryan, and McSherry, J.

*John Prentiss Poe*, for the appellant.

*Frederick W. Story*, and *Charles Marshall*, for the appellee.

The holder of the check was wholly ignorant of the arrangement between the drawer and the Bank by

which the latter agreed to pay the check with full knowledge that it would overdraw, to its whole amount, the account of the drawer. Such a payment is binding as between the Bank and the holder, and cannot be recovered back. *Morse on Banking*, 269–270; *Chambers vs. Miller*, 13 *C. B.*, (*N. S.*,) 125; *Boylston National Bk. vs. Richardson, et al.*, 101 *Mass.*, 287; *Commercial and Farmers National Bank vs. First National Bank*, 30 *Md.*, 27; *Oddie vs. National City Bank of New York*, 45 *N. Y.*, 735; *Reynolds vs. Chettle*, 2 *Campbell*, 596.

The authorities cited below establish that under the circumstances of this case the Bank would have no right to indemnity, or even to contribution, as against Veazey, and, *a fortiori*, none against Swift, even if the latter can in any way be regarded as morally guilty of participation in the wrong by which the Veazey-Williams credit was diverted, *at the suggestion of the Bank*, to the payment of a check which the Bank knew could not, in the form in which the holder received it, be charged against that credit. *Minnis vs. Johnson*, 1 *Duvall*, (*Ky.*,) 171; *Merryweather vs. Nixon*, 8 *T. R.*, 186; *Acheson vs. Miller*, 18 *Ohio*, 1; *Anderson vs. Saylors*, 3 *Head* (*Tenn.*,) 551; *Adamson vs. Jarvis*, 4 *Bing.*, 71; *Betts vs. Gibbins*, 2 *Ad. & E.*, 56, (74–77;) *Miller vs. Fenton*, 11 *Paige*, 18; *Arnold vs. Clifford*, 2 *Sumner*, 238; *Colburn vs. Patmore*, 1 *Cr. M. & R.*, 73, (83;) *Peck vs. Ellis*, 2 *Johnson Ch.*, *131, [*136;] *Lingard vs. Bromley*, 1 *Vesey & Beames*, 116, [117;] *Deering vs. Earl of Winchelsea*, 2 *Bos. & Pull.*, 271.

BRYAN, J., delivered the opinion of the Court.

When this case was before the Court on the first appeal, it was decided that the Manufacturers' Bank and Swift were both responsible to the trustees of the Bull estate for the full amount of the sum now in controversy. It was held that the question of primary

and secondary liability was not presented, and the Court studiously refrained from determining which of these parties must ultimately bear the loss; laying down the rule as applicable to the case that all parties to a breach of trust are equally liable, and there is no primary liability. 68 *Md.*, 236. No further controversy is admissible on the questions then decided. Since the decree of this Court the Manufacturers' Bank has paid to the trustees of the Bull estate the whole of this sum, and we are now required to determine whether Swift is bound to indemnify the Bank in whole or in part.

We will mention some of the prominent facts which show the relations between the parties in respect to this matter; and then we will consider other matters in evidence which are supposed to change or modify these relations. Veazey was the trustee of the Gazette Publishing Company, and in that capacity was required to pay to Swift the sum of fourteen thousand one hundred and forty-four dollars and eighty-two cents. On the fifteenth day of July, 1886, he delivered to E. O. Hinkley, Esq., Swift's solicitor, a check for this amount on the Manufacturers' Bank, signed "I. Parker Veazey, Trustee," and received from him a release of Swift's claim. This check was paid by the said Bank, although Veazey had no funds in the Bank at the time of payment properly applicable to this purpose. If there were nothing further in the case, the question would be of the simplest possible description. It is the duty of a Bank to know the state of its depositor's account, and if it makes a mistake in this respect it must abide the consequences. The presentation of a check is a demand for payment; if it is paid, all the rights of the payee have been satisfied, and he is not entitled to ask any questions. It would forever destroy the character of a Bank in all commercial circles, if when it was ready

and willing to pay a check, it permitted the holder to enquire if the drawer had funds there to meet it. It is a matter with which he has no concern. In the absence of fraud on the part of the holder, the payment of a check by a Bank is regarded as a finality. And the fact that the drawer had no funds on deposit will not give the Bank any remedy against the holder. *Oddie vs. National City Bank of New York,* 45 *New York,* 735.

In *Levy vs. Bank of the United States,* 1 *Binney,* 27, and 4 *Dallas,* 234, one Thomas passed to Levy a check on the Bank purporting to be drawn by one Wharton in favor of Thomas, or bearer; this check was received by the teller, and entered to Levy's credit in his bank book as cash. On the same day, in the course of a few hours, it was discovered that the signature to the check was a forgery; and, as soon as the discovery was made, notice of it was given to Levy. It was held that the loss must fall on the Bank. This decision is cited with approval by the Supreme Court of the United States in *United States Bank vs. Bank of Georgia,* 10 *Wheaton,* 333. It is also approved by this Court in *Commercial and Farmers National Bank vs. First National Bank,* 30 *Md.,* 19; where the case in Wheaton, and other cases of similar bearing, are also adopted. Unless there is something to take the present case out of the general rule, we think it very clear that the payment of Veazey's check was conclusively binding on the Manufacturers' Bank.

When Mr. Hinkley received this check from Mr. Veazey, he deposited it in the Union Bank to the credit of Hinkley & Morris, a legal firm of which he was the senior member. On the following day it was sent through the Clearing House to the Manufacturers' Bank; and payment of it being refused, it was returned to the Union Bank. Thereupon it was delivered to

Hinkley, and he gave the Union Bank the check of Hinkley & Morris for the same amount, to counterbalance the credit they had received for it.    Within a few minutes after he had received the Veazey check from the Union Bank, Mr. Hinkley was informed by Mr. Veazey, and Mr. Hindes, the cashier of the Manufacturers' Bank, that the check was "all right," and he immediately de-deposited it a second time in the Union Bank, and in the course of the day it was paid.    The occurrences must now be noticed which caused this mode of dealing with the check.    Messrs. Veazey and E. Calvin Williams were trustees of the Bull estate, and as such were entitled to receive from J. C. C. Justis twenty-eight thousand one hundred and twenty-one dollars and fifty-five cents. During the absence of Mr. Williams in Europe, Mr. Veazey was authorized by an order of Court to receive the money.    On the fifteenth day of July, 1886, a check on the Mechanics' Bank for the amount was delivered to him, which by due endorsement had been made payable to the order of I. Parker Veazey and E. Calvin Williams, trustees.    This check Veazey endorsed and deposited in the Manufacturers' Bank to the credit of an account of "I. Parker Veazey, trustee."    This check passing through the Clearing House, on the following day reached the Mechanics' Bank and payment was refused because it was not endorsed by both of the trustees, Veazey and Williams.    Notice being given to the Manufacturers' Bank, it in turn, gave notice to the Union Bank that Veazey's check to Hinkley would not be paid.    Later in the day a deposit was made by Justis to the amount of this check in the Manufacturers' Bank to the credit of I. Parker Veazey and E. Calvin Williams, trustees; and it was agreed betwen Veazey and the said Bank that the check to Hinkley should be paid, and that it should be altered by affixing the name of E. Calvin Williams,

trustee, as one of the drawers. Of this transaction Hinkley was kept in entire ignorance. Notice was then given by the Manufacturers' Bank to the Union Bank that the check was recognized as good, and it was delivered to the runner of the former Bank. According to the rules of the Clearing House, this receipt and recognition of the check was a payment of it, and entitled the Union Bank to a credit for its amount in settlement with the Manufacturers' Bank. After the payment thus made, the signature of the check was altered by Veazey so as to read as follows: "I. Parker Veazey, trustee, E. Calvin Williams, trustee, per I. Parker Veazey." The check when delivered to Hinkley was in form and legal effect such as he was entitled to receive, and such it remained until it was paid by the Bank on which it was drawn, with a full and entire knowledge of every circumstance connected with it from its origin until its payment. Immediately on its payment, Mr. Hinkley remits the proceeds to his client who resided in another State. On the twenty-eighth of September, two months and twelve days after the settlement of the business, he hears for the first time that objections are urged against the payment of the check. If the Bank could recover this money from Swift, it would be an extremely dangerous matter to do business with a Bank; no one could know when he could safely receive payment of a check. We think, however, that the law has provided rules for the transaction of this kind of business, which are sound and sensible, and which promote convenience and security in commercial dealings. When with full and perfect knowledge of the facts, and without the least element of surprise, imposition, or misrepresentation, a Bank has elected to pay a check, the law could never permit it to undo the transaction, and recover the money back. The alteration of the signature of the check after it had

been paid was a nugatory act.   It could not authorize the Bank to charge the check against the account standing in the name of the two trustees.   That account could be legally charged only by a check signed by both of them.   Entering the Hinkley check on the books of the Bank as a debit against this account was without significance; the responsibility of the Bank was not in the least degree diminished by such an entry.

The foregoing considerations are intended to show how the Bank and Swift stand in reference to each other.   On the former appeal it was held that *as against the representatives of the Bull trust,* Swift could not be "allowed to retain the money, which had been paid to him from a fund on which he had no claim, and which was charged against that fund and no other."   But in the present controversy the Bull trust is in no wise interested; it has been fully reimbursed for the conversion of its money.   This conversion was effected by the wrongful change in the signature of the Veazey check after it had been paid;—a change made without Hinkley's knowledge or consent; and after the check had passed out of his possession and beyond his control. The simplest principles of justice require that those who did this great wrong to the trust fund should redress the injury which they committed.   They should be compelled to restore the spoliated trust fund to its original integrity.   But assuredly there is nothing in the transaction which can give them recourse against any other person.   The responsibilities of third persons are measured by their own conduct.   If they have done the agents of this mischief no wrong, they cannot be required to make them any compensation.   The Bank can derive no special claim from the fact that it was dealing in this unauthorized way with trust funds. While with respect to the Bank, Swift stands like any other holder of a check who presents it in the ordinary

course of business, and receives payment without knowledge of any peculiar circumstances affecting it.

In our opinion the matters which we have stated settle the rights and responsibilities of these parties. And it is perhaps not strictly necessary that we should give our views upon other questions which have been discussed at the bar. We, however, take occasion to say that while the officers of the Manufacturers' Bank committed great errors of judgment, there was not the least purpose to do any intentional wrong to anybody. We regard the conduct of Mr. Hinkley as highly becoming to an upright and intelligent solicitor. We are satisfied that he did not know, and had no reason to believe that Veazey was committing a breach of trust. A gentleman from his office, who, at his request called on Veazey for the money due from the Gazette Publishing Company, had been told by Veazey "that it was out on call, that he would have to give some notice, and that it would take several days to get it in." Veazey also told Hinkley that he would have to give "notice" before he could get it. When he received Veazey's check, it was in a form sufficient and appropriate to pay the money of the Gazette Publishing Company, and it was deposited in Bank in strict conformity to the usual course of business. With regard to Mr. Hindes' testimony in reference to a conversation which he says he held with him in the Union Bank on the sixteenth of July about half past twelve o'clock, we are constrained to think there is some error. He says that he told Hinkley that the check would not be paid, and that Mr. Williams was associated in the matter. Hinkley positively and emphatically denies that any such conversation took place, and says that he does not remember that he was in the Union Bank on that day, except on one occasion, and that was about eleven o'clock, immediately after he had been assured both

by Veazey and Hindes that the check was "all right."
Mr. Wells, the cashier of the Union Bank, testifies
that he saw him at this time; and no one connected
with the Bank testifies that he was there at any other
time during the day.   The singularity of such a con-
versation must have made an impression on his mind
which he could not have forgotten.   Let us consider
how the case would have stood.   A check for a large
amount is refused payment; immediately afterwards
the holder is informed by the drawer of the check and
the cashier of the Bank which refused it, that it was
all right, and he is requested to re-deposit it; in
about an hour and a half he is informed by the same
cashier that it will not be paid; and then after the de-
lay of about an hour the check is paid.   An experience
so unusual and extraordinary must have made a last-
ing impression on the memory.   Mr. Hindes probably
mistook some other person for Mr. Hinkley, or he may
have confounded together some of the many conversa-
tions which took place on this subject.

   The decision of the Circuit Court is in accordance
with our views, and it will be affirmed, with costs.

                         *Order affirmed, with costs.*