# THE NATIONAL BANK OF BALTIMORE

*vs.*

# THE DROVERS AND MECHANICS NATIONAL BANK OF BALTIMORE.

*Rule of Clearing House—Notice of Forgery—Rights as Between Banks.*

The failure of a bank on which a check was drawn to comply with a rule of the local clearing house that "in the case of errors in the exchanges and claims for missent items, notice must be given by 12 o'clock noon," did not preclude recovery by it from the bank, which presented such check for payment, of the amount paid by it thereon, it having subsequently, on the same day, discovered that the certification of the check was forged and having immediately so notified the presenting bank, and the latter having suffered no loss by reason of the failure to notify it at the time named in the rule.

*Decided March 16th, 1923.*

Appeal from the Court of Common Pleas of Baltimore City (STEIN, J.).

Action by the Drovers and Mechanics National Bank of Baltimore against the National Bank of Baltimore. From a judgment for plaintiff, defendant appeals. Affirmed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*John Hinkley,* for the appellant.

*Alfred S. Niles* and *Carlyle Barton,* with whom were *Niles, Wolff, Barton & Morrow* on the brief, for the appellee.

Boyd, C. J., delivered the opinion of the Court.

The appellee sued the appellant to recover the sum of $2,500 with interest, paid in error by the appellee to the appellant, on account of a check appearing to have been drawn by John B. Hammond to the order of Chester Page, on the Drovers and Mechanics National Bank of Baltimore, dated February 24, 1922, for that amount, and bearing the forged certification of the teller of that bank. The check was cashed by the Bank of Baltimore on Saturday, February 25, 1922, paying Chester Page, a depositor in that bank, who presented the check about eleven o'clock, the amount in currency. It was sent to the clearing house on Monday, February 27, and the items presented by the defendant against the plaintiff were delivered to the agent of the plaintiff and taken to its banking house.

The Baltimore Clearing House is an association of some of the banks in Baltimore, including the plaintiff and defendant, and "for the purpose of effecting settlement of the daily balances between them, and for the promotion of their interests." By article 6 of its constitution, it is provided that "such banks as desire a preliminary exchange of sealed packages between themselves, each bank giving to the other its receipt for the amount indicated on the outside of the sealed package, on printed forms to be provided therefor, shall meet for this purpose at 8.15 A. M. at the Clearing House each morning, such receipts to be charged against the respective banks at the regular clearing, which shall be at 9.45 A. M. precisely; checks and items represented by these receipts to be governed by the same regulations which govern items cleared through the regular clearing at 9.45 A. M." Settlements of daily balances are made by transfer of funds of the respective members on deposit with the Baltimore Branch of the Federal Reserve Bank of Richmond. There is an afternoon clearing at 1 P. M., except on Saturdays, when the hour is 12 noon.

In article 8 of the constitution there is this provision:

"In the case of errors in the exchanges and claims arising from mis-sent items, notice must be given by 12 o'clock noon and adjustment made directly, between the banks which are parties thereto and not through the Clearing House. In the case of claims arising from checks that are 'not good' or irregular, or from other causes, notice must likewise be given before 12 o'clock noon, and the adjustment may be made directly between the banks parties thereto, or at the clearing of returned items held in the afternoon of the same day, as next hereinafter provided. Upon request made before 12 o'clock noon, any bank shall extend until 1 o'clock P. M. the time for returning items on it as 'not good.'"

According to the custom of the plaintiff, the bundle of items received from another bank is first handed to the clerks, who verify the amounts and then turn over the items to the receiving and paying tellers, or their assistants, who examine them with reference to the signatures. They are then given to clerks, who examine them to see if the endorsements are regular, and, if they are, they are assorted according to the initial letters of the persons against whom they are to be charged. Certified checks are charged against the drawers at the time of the certification, and hence they are not given to the bookkeepers when they are returned, but are set aside for the paying teller to compare them with his certified check blotter, and the memorandum of such outstanding checks so returned to be cancelled. Some other items go to the paying teller besides certified checks. Several of the clerks of the bank were sick on that day, and the paying teller did not examine the certified checks until about 2.15 P. M. There was a valid certification of a check for $2,500 dated February 24th, 1922, signed by "John B. Hammond" and endorsed by "Chester Page," and on the 25th of February the teller of the Drovers and Mechanics Bank paid that check to Hammond and took it up. Upon looking, about 2.15 P. M., at the certified checks sent from the clearing house

on the morning of the 27th, the teller saw two similar certified checks to the one that he paid on the previous Saturday, one of which had been cashed by the Bank of Baltimore. Seeing that they were forgeries of the certification he had made on the 24th, the teller at once told the vice-president of the plaintiff of his discovery. Upon further examination, they found that there were seven forged certifications (including the one paid by the defendant) presented to different banks on the 25th, all of which had been paid and sent to the clearing house. The banks, including the defendant, were at once notified.

Whether or not "John B. Hammond" and "Chester Page" were one and the same person, or Page was a confederate of Hammond, is not definitely known, but on February 4th, 1922, "John B. Hammond" opened an account with the Drovers and Mechanics Bank, made deposits and checked on them, and on the 24th of February he had a little over $2,500 to his credit. "Chester Page" opened, in the Bank of Baltimore, a "commercial account" in which he deposited $500, and a "savings account" in which he deposited $50. Between the two men, or the one man of two names, as the case may be, they got $20,000 out of eight banks in Baltimore on a deposit of $2,500 in one, plus some little balances they left. Hammond and Page, or Hammond *alias* Page, whichever it was, forged, or had forged by some one, the certification on the check cashed by the Bank of Baltimore, and, as we understand, six others. The protectograph used on the valid certification was not on the forged certification, and the valid one was written in green ink, while that on the forged ones was in black ink. The name of the drawer was not forged, nor was that of the payee.

It was agreed that on February 27th, 1922, the plaintiff bank was charged, through the clearing House, with $34,437.30 in favor of the defendant bank, and was credited with $23,690.49 against it. Included in the amount charged against the plaintiff was the check of $2,500, upon which

was the forged certification. That balance was settled in the usual manner at 12 o'clock on that day.

The case was tried before JUDGE STEIN, sitting as a jury, in the Court of Common Pleas of Baltimore City. There are six bills of exception, presenting rulings on evidence, and the seventh, which includes the action of the court on the prayers. The plaintiff offered four prayers, all of which were rejected excepting the second, and the defendant offered two, both of which were rejected. The defendant excepted to the granting of the plaintiff's second prayer and the rejection of its two prayers. The principal question to be determined is whether the failure to give the defendant notice of the forgery by the time named in article 8 of the constitution of the clearing house, quoted above, defeats a recovery, and as the plaintiff's second and the defendant's second prayer present the positions of the respective parties, we will first consider them. The theory of the plaintiff is that, as the defendant did not take any action to its detriment which was induced by failure of the plaintiff to give notice of the forgery within the time prescribed by the rules of the clearing house, its failure to do so does not prevent a recovery, while that of the defendant is that, as the notice was not given as fixed by the rule, payment of the check had become final and the plaintiff was not entitled to recover.

It does not seem to us to be material that the check in controversy was actually signed by the drawer and endorsed by the payee. It is not contended that the appellant's paying teller would have cashed the check, if he had not believed it to be certified as good by the teller of the appellee. Indeed, in the cross-examination of Mr. Fisher, the paying teller of the appellant, who paid out the money, he was asked: "If the certification had not been on it, you would not have cashed that check, would you?" and he replied: "I would not." It is, therefore, not the case of a bank paying an ordinary check drawn on it by one of its depositors, or so acting as to induce another bank to believe it to be good, but,

in point of fact, the plaintiff did not know that such a check
as this was in existence until after it came from the clearing
house, and purporting to be a certified check, the officer
whose duty it was to examine it, did not know it until some
time after two o'clock on Monday, February 27th. By sec-
tion 207 of article 13 of the Code, in the Negotiable Instru-
ments Act, it is provided: "When the holder of a check pro-
cures it to be accepted or certified, the drawer and all en-
dorsers are discharged from liability thereon." It was said
in *Scheffenacker* v. *Hoopes,* 113 Md. 111: "The legal effect
of such a certification is that the funds of the drawer are
appropriated to the amount of the check and he is released,
while the check is converted into a certificate of deposit, upon
which the bank became the debtor of the holder." The argu-
ment of appellant, under the first head in his brief—"the
check was a genuine check of a depositor and was paid, though
his funds on deposit were insufficient"—is therefore not easy
to understand, especially when it is said, "the forged certifi-
cation is immaterial."

In 3 *R. C. L.* 653, it is said: "The right of a member of
a clearing house to return items not properly chargeable
against it, secured by the rules of the clearing house, is a
special provision in compensation for payment without in-
spection.   Instead thereof, the rules give opportunity for
subsequent inspection.   When that has been had, the special
rules cease to govern, and the rights of the paying bank rest
upon the general principles of law."

In the note there are cited *Commercial and Farmers Nat.
Bank* v. *First Nat. Bank,* 30 Md. 11; *Merchants Nat. Bank*
v. *Nat. Eagle Bank,* 101 Mass. 281; *Nat. Bank of North
America* v. *Bangs,* 106 Mass. 441. JUDGE MILLER said, on
page 16 of 30 Md., that, "by the custom and usage of all the
banks in the City of Baltimore, proved by all the witnesses,
when a check is sent through the clearing house to the bank on
which it is drawn, and is not heard from before eleven o'clock
on the day on which it is so sent, the bank sending it has a

right to assume it was good or had been paid, *and to act accordingly.*" (Italics ours.)   In 7 *C. J.* 899, it is stated: "A very common rule of clearing houses is one limiting the time within which an alleged error may be corrected; but in a proper case, a correction may be allowed even after the expiration of such time, as in case of a mistake of fact; and it has been held that the effect of such a limitation of time may be waived."   In a note, it is said:   "Before the expiration of the period allowed for examination and adjustment by payments between the banks, payment through the clearing house, if indeed it can be termed payment, is regarded as provisional only," citing *Preston* v. *Canadian Bk. of Commerce,* 23 Fed. 179; *Atlas Natl. Bank* v. *Nat. Exch. Bank,* 176 Mass. 300; *Merchants Nat. Bk.* v. *Commonwealth Nat. Bank,* 139 Mass. 513; *Merchants' Nat. Bank* v. *Nat. Eagle Bank,* 101 Mass. 281, 100 *Am. Dec.* 120; *Nat. Exch. Bank* v. *Nat. Bk. of North America,* 132 Mass. 147.   Then it is said, "after the expiration of such time, payment is regarded as absolute," citing the *Preston case* and 176 Mass., *supra.* In reference to the statement that in a proper case a correction may be allowed, even after the expiration of such time, there are cited the case in 139 Mass. 513; *Manufacturers' Nat. Bank* v. *Thompson,* 129 Mass. 438, 37 *Am. Rep.* 376; *Citizens' Cent. Nat. Bank* v. *New Amsterdam Nat. Bank,* 128 App. Div. 554, 112 N. Y. S. 973, affirmed in 198 N. Y. 520, 92 N. E. 1080.

In the note to *Nat. Exchange Bank* v. *Ginn & Co.,* 114 Md. 181, to be found in Ann. Cas. 1914C, beginning on p. 512, there is a full discussion of the subject of clearing houses, and on p. 522 there is a heading of "adjustment of accounts and return of repudiated items."   The annotator says there is a conflict as to the right of a bank to which a check has been charged in the clearing house, and which has not repudiated it within the time prescribed by the rules, to recover the sum paid thereon as money paid under mistake on discovering that the check was forged, or that the drawer's

funds were insufficient," and a number of authorities are referred to. There is some difference in the wording of the rules and regulations adopted by clearing houses in the different cities, but for the most part they are the same in effect in regard to fixing a time within which the paying bank shall give notice that a check is not good. The object in naming a time cannot be, certainly ought not to be, in doubt. It could not have been intended to make one bank pay for the loss of money by another which loss the former was in no way responsible for as was said in *Merchants' Nat. Bank* v. *Nat. Eagle Bank,* 101 Mass. 281: "The manifest purpose of the provision is to fix a time at which the creditor bank may be authorized to treat the check as paid, and be able to regulate with safety its relations to other parties. We cannot adopt the theory that a failure to present a bad check, before the time named, to the bank sending it through the clearing house, works an absolute forfeiture and is in itself a perfect bar to any action to recover the amount of such check."

What we have quoted above from 30 Md., where it speaks of a check not being heard from before the hour named and says, "The bank sending it has a right to assume it was good or had been paid, and to act accordingly," undoubtedly meant that it had the right "to act accordingly" in its dealings with third parties. In that case, the paying bank did not notify the presenting bank that the check was a forgery until eight days after the presenting bank had sent it to the clearing house, and the day after that the forger drew out the money, but JUDGE MILLER did not, even in a case of that kind, where there was loss to the presenting bank, rest his opinion on the mere fact of the notice not being given, as required by the rules. Although the defendant in that case entered the check as cash when it was left with it, the cashier instructed its officers not to allow the amount to be drawn on until it was first ascertained that the check was good or had been paid, and JUDGE MILLER said: "Having done so, and having in fact paid to such party, after the check had been paid by the

plaintiff, it is impossible to say the defendant has not been placed in a worse position in consequence of such payment by the plaintiff," the inference being that if it had not been so placed, the court might have reached a different conclusion.

In *Second Nat.* v. *Western Nat. Bank,* 51 Md. 128, the Second National held, by the endorsement of the payees, a note of the makers, payable at the Western Bank, at which the makers kept a deposit account. On the day of its maturity, about half past eleven o'clock, it was certified by the teller of the Western as "good." The runner of the Second proceeded on his rounds and returned with the note to the Second about 1 o'clock, when he told the president that the note had been paid, "meaning thereby, that it had been certified." About the same time, the teller of the Western noticed an order of the makers received that day directing him not to certify the note. He immediately sent the order to the Second, with a note calling the attention of the bank to it, and requesting that his name might be erased. The messenger reported on his return that the president of the Second said "All right." About the same time, a message was sent from the Second to the endorsers requesting them to call at that bank, and one of the firm did so. The president of the Second stated to him the facts of the certification and the demand for its erasure, and the member of the firm who was there consented to waive protest and wrote "protest waived" on it. That was not later than 2 o'clock, and at about 3 o'clock it became known that the makers had failed. The next day, the Second, without erasing the certification, sent the note to the clearing house, debited to the Western Bank, and received the money for it. The teller of the Western, upon receiving his clearing house list of that day, found the note entered and debited to that bank. He at once erased the certification and went with the note to the Second, where he demanded and received the money for it, and left the note there. The Second sued the Western to recover the amount of the note.

It was said in that case that if "the Second National Bank had been misled by the certificate and, relying upon its accuracy, had omitted to take steps to charge the endorsers, there can be no doubt the Western Bank would be bound to make good the amount of the note. But the facts are that the Second National Bank was informed of the error so soon as it was discovered, and in time to fix the responsibility of the endorsers either by protest, or by getting from them, as it did, a waiver of protest. There is no principle of law better established than that an error of fact may be corrected in any reasonable time before it is acted upon by the other party relying on its truth and accuracy. There can be no such stringent rule of law as would make a memorandum of this description irrevocable the moment it is placed upon the note. If put there in error, like any other error or mistake, it may be corrected before rights and liabilities have been incurred or losses sustained in consequence of it. * * * But even if steps had not been taken to fix the liability of the endorsers, the Western Bank could not have been held liable, as the corrected information was given in time to do so, and the presenting bank was bound to accept and to act upon it. *Bank* v. *Wetherald,* 36 N. Y. 337." There was an attempt in that case to prove a usage that a certification could not be revoked before new rights had been acquired on the faith of said certification, but the court said it was not proven, and if such a usage existed it was unreasonable and repugnant to the well settled rule of law, and added: "Errors, as we have already said, may always be corrected before the other party, acting upon them as true, has incurred any loss or damage, or assumed any new rights or liabilities. The rule rests upon the soundest principles of reason and justice, and any usage in conflict with it would be so unreasonable and unjust that it cannot be maintained."

In *Nat. Bank of Commerce* v. *Ballo. Commercial Bank,* 141 Md. 554, we expressly affirmed that decision, notwithstanding the Negotiable Instruments Act, now in article 13 of our Code. We said: "The general rule is conceded by

the appellant to be that, by certification, a bank enters into an absolute undertaking to pay the check or draft when presented (7 C. J. 707), but attention is called to the well established exception that where such certification is made by mistake, such mistake may be corrected so long as the rights of third persons have not intervened (7 C. J. 709), *Second Natl. Bank* v. *Western Nat. Bank,* 51 Md. 128." Again, it was said: "While, in a proper case, we regard the exception to the general rule before referred to as fully established (*Second Natl. Bank case, supra*) yet to entitle the bank to free itself from the obligations imposed by its own voluntary act of certification, there must be a clear showing that such act was done in error."

The case of *Nat. Exchange Bank* v. *Ginn & Co.,* 114 Md. 181, Ann. Cases, 1914 C 508, referred to above, did not involve the clearing house rules, as Ginn & Co. were not members, and of course were not bound by them. The National Exchange Bank paid a check dated October 19th, 1909, which the William J. C. Dulaney Company drew on it to the order of Ginn and Company. It was, on October 20th, sent to Baltimore by the payee's bank to the Farmers and Merchants Bank of Baltimore, and on the 21st was paid through the clearing house, being paid about 11 o'clock. Within an hour after the National Exchange Bank paid the check, it was learned that receivers had been appointed for the Dulaney Company and of its insolvency. One of the officers of the bank immediately offered to return the check to the Farmers and Merchants and requested repayment. That was refused, and an attachment was issued against Ginn and Company, being non-residents, and laid in the hands of the Farmers and Merchants as garnishee. The question was whether, because of its ignorance of the drawer's insolvency at the time of the payment of the check, the Exchange Bank was entitled to recover the amount paid to the holder, in order that its right of set-off against the drawer could be utilized. Judge Urner, in the opinion filed, cited many cases, including *Manfrs. Nat. Bank* v. *Swift,* 70 Md. 515;

*Oddie* v. *Nat. City Bank,* 45 N. Y. 735; *First Nat. Bank* v. *Burkham,* 32 Mich. 328; *Nat. Bank* v. *Berrall,* 70 N. J. L. 757; *Citizens' Bank of Norfolk* v. *Schwarzschild,* 109 Va. 539; *Commercial & Farmers' Nat. Bank* v. *First Nat.,* 30 Md. 11; *Handy* v. *Chesapeake Bank,* 51 Md. 562, all of which, together with others, are cited by the appellant in this case and urged upon us, especially the Maryland cases, but it seems clear to us that none of them are applicable to the real questions in this case. Before leaving the *Ginn case,* we must call attention to the fact that JUDGE URNER distinguished the case of *Second Nat. Bank* v. *Western Bank,* 51 Md. 128 by saying, "In that case the bank was permitted to cancel its certification of a note for payment where it had been so marked contrary to a written order of the makers which had been overlooked, *and where no rights or liabilities had been incurred or losses sustained in consequence of the error.*" (Italics ours.)

No one can have any doubt at this date about the law, when a bank pays genuine checks of its depositors. As this Court, as well as others, has often said, it is the business of a bank to know the state of its depositors' accounts, and if it makes a mistake in this respect, it must abide the consequences. As was said in *Oddie* v. *Nat. City Bank, supra,* cited by JUDGE URNER in the above mentioned case, where a check is presented to a bank, "it has the right to reject it, or to refuse to pay it, or to receive it conditionally, * * * but if it accepts such a check and pays it, either by delivering the currency or giving the party credit for it, the transaction is closed between the bank and such party, provided the paper is genuine." It may be well to say in passing, the law in Massachusetts and New York, relied on by the appellee in this case on the main question, is not unlike that in practically all of the states in this country, unless controlled by statutes in reference to the duty of banks in paying checks of their depositors, and we confess we are at a loss to know upon what theory the appellant relies so much upon that class of cases when the facts of this case are remembered.

There are several marked and clear distinctions between most of the cases relied on by the appellant and this one. In the first place, in most of them what is spoken of as "payment" was not such a payment as that in this case. As we have seen, the officers of the bank did not in fact know of the existence of such a check as this, and of course did not know of the forged certification on it, until after two o'clock, and it is useless, therefore, to undertake to hold it responsible on the theory that a bank has the right to reject or accept a check of its depositors, and as the plaintiff did not reject this one, but accepted it with the knowledge it had, or ought to have had, it is liable. It cannot be contended that it did have actual knowledge, and the only possible ground upon which it can be claimed that it was its duty to know before twelve o'clock that such a check was in existence, and to notify the appellant by that time that the certificate was a forgery and the check invalid, is the rule of the clearing house, which the appellant seems to contend can have no exceptions read into it, such as there may be in a statute of this and other states on commercial law, as shown by some of our own decisions referred to above. Many reasons suggest themselves for not always dealing with a rule of this kind "according to the laws of the Medes and Persians." A fire might occur which would delay the work in a bank for an hour or two, something might happen to the messenger, an unusual amount of business requiring more than ordinary time, or sickness of some of the bank force during an epidemic such as we have experienced in late years, may delay the work. The latter was given as the cause of the delay in this case. The cashier testified "we were short handed that day. It was during the spell of the grippe and several of the employees were away." While we do not deem it necessary to base our conclusions on that alone, it is proper to consider it in connection with the rule, as we cannot believe that those who framed the rule intended to exclude all possible exceptions to its very letter, regardless of everything but the time of day.

But it does seem to us to be perfectly clear that a proper construction of the language, "notice must likewise be given before twelve o'clock noon" cannot mean, and was not intended to mean, that the presenting bank can require the receiving bank to pay a check, simply because the notice that it was not good was not given before twelve o'clock noon, although the presenting bank did not lose a penny by the failure to receive the notice by that time. It may be that, under other circumstances, it was regarded as essential to have a time fixed, and that ordinarily there can be no deviation from that time, but when it is impossible for the presenting bank to lose anything, and in fact it lost nothing by the delay, the reason of the rule—certainly a valid reason for the rule—does not exist. Stress was laid on the word "must" at the argument, but words must be construed in a rule of that kind just as in any other rule, or in a statute. We must not construe that word or that rule independent of all others in the constitution adopted by the clearing house, and when the object of the rule is considered, it is clear that it means that the notice must be given in order to enable the presenting bank to protect itself and its clients against loss. In order to protect itself from damages for such loss, the receiving bank must, under the rule, give the notice by twelve o'clock noon, although it would be impossible to give it if it did not itself know that there was such a check in existence; but we are not now concerned about a case of that kind, and do not mean by what we say to decide what, if anything, will excuse a failure to give the notice, if that failure causes loss to the presenting bank. We realize fully the importance of having a fixed time in such matters, and that members of the clearing house must live up to the rules or take the consequences, if the presenting bank sustains loss by its failure to do so. In this case the currency was paid by the appellant to its depositor on Saturday, without making any inquiry of the appellee or waiting until twelve o'clock on Monday, when it could have known whether the check was good, but it chose, rather than to run the risk of offending

that customer, to take the chances—opened the cage and the bird flew. It would be rather difficult to base a defense on the ground that, of two innocent parties involved, the drawee bank should suffer, although it did not know of the forgery, or even of the check, and the first time it could know of it, unless the appellant notified it, was on Monday, after the money and the forger were gone. But we place our decision on the ground that the defendant did not sustain any loss by reason of the failure of the appellee to give the notice by 12 o'clock, or by reason of any act or failure to act by the appellee.

We are therefore satisfied that, under a proper reasoning of the questions involved, the plaintiff is entitled to recover, and we also are of the opinion that the weight of authority is with the appellee. We cannot adopt the decision of the United States District Court in *Preston* v. *Canadian Bank of Commerce*, 23 Fed. 181, so much relied on by the appellant, or the case of *Nat. Bank of Commerce* v. *Mechanics American Nat. Bank*, 148 Mo. App. 1. Neither of those cases was decided by a court of last resort, although by judges whose opinions we respect, but cannot concur in. On the other hand the cases of *Merchants Nat. Bank* v. *Nat. Eagle Bank*, 101 Mass. 281; *Boyleston Nat. Bank* v. *Richardson*, 101 Mass. 287; *Nat. Bank of North America* v. *Bangs*, 106 Mass. 441; *Nat. Exch. Bank* v. *Nat. Bank of North America*, 132 Mass. 147; *Merchants National Bank* v. *Nat. Bank of Commonwealth*, 139 Mass. 513; *Citizens' Cent. Nat. Bank* v. *New Amsterdam Nat. Bk.*, 128 App. Div. 554, 112 N. Y. S. 973, affirmed in 198 N. Y. 520, are much more satisfactory to us, although there may be some statements in some of them not necessary to adopt. *Watson's Law of Clearing Houses*, 39, 45, also approves of the reasoning we have adopted—Mr. Watson being the author of the article on Clearing Houses in 6 *Am. and Eng. Enc. of Law*, 113-130. We will not prolong this opinion by discussing those authorities or referring to them more fully than we have already

done in this opinion, but they support our view of the law as stated above.

We do not think the custom undertaken to be shown by the appellee as to the banks waiving the rules of the clearing house was established by the proof, and hence it is not necessary to discuss the other exceptions, but we are of the opinion that the lower court was right in granting the plaintiff's second prayer and in rejecting the defendant's two prayers, and will affirm the judgment.

*Judgment affirmed, the appellant to pay the cost.*